ILLINOIS NURSES ASSOCIATION, Petitioner, v. BOARD OF TRUSTEES OF THE UNIVERSITY OF ILLINOIS, Respondent and Cross-Petitioner (The Illinois Educational Labor Relations Board, Respondent and Cross-Respondent).—BOARD OF TRUSTEES OF THE UNIVERSITY OF ILLINOIS, Petitioner, v. ILLINOIS NURSES ASSOCIATION et al., Respondents.—BOARD OF TRUSTEES OF THE UNIVERSITY OF ILLINOIS, Petitioner, v. GENERAL SERVICE EMPLOYEES UNION, LOCAL 73, et al., Respondents.

First District (6th Division) Nos. 1—99—3324, 1—99—3732, 1—99—3733 cons.

Opinion filed November 22, 2000.—Rehearing denied January 11, 2001.—Modified opinion filed February 2, 2001.

Joel A. D'Alba, of Asher Gittler Greenfield & D'Alba, Ltd., of Chicago, for Illinois Nurses Association.

Thomas H. Riley, Jr., of Office of University Counsel, and Seyfarth Shaw Fairweather & Geraldson, both of Chicago (R. Theodore Clark, Jr., Thomas J. Piskorski, and Jill S. Vorobiev, of counsel), for Board of Trustees of the University of Illinois.

James E. Ryan, Attorney General, of Chicago (Joel D. Bertocchi, Solicitor General, and Brian F. Barov, Assistant Attorney General, of counsel), and Julie K. Hughes, General Counsel, for respondent Illinois Educational Labor Relations Board.

Katz Friedman Schur & Eagle, of Chicago (Denise S. Poloyac and Martha

A. Garcia, of counsel), for respondent General Service Employees Union, Local 73.

JUSTICE O'BRIEN delivered the opinion of the court:

This consolidated appeal involves three employees of the University of Illinois (University), Joyce Tomanek, Linda Leonard, and Diana Perez, who were discharged by the University for various acts of alleged misconduct. The employees, through their respective unions, grieved the discharge decisions to arbitration. The arbitrators ordered the three employees reinstated; however, the University refused to comply with the arbitrators' awards. The employees' unions then filed unfair labor practice charges against the University for its refusal to comply with the arbitrators' awards ordering the employees' reinstatement. The Illinois Educational Labor Relations Board (Board) affirmed the arbitrators' orders reinstating Leonard and Perez, but reversed the arbitrator's order reinstating Tomanek. On appeal, . Tomanek argues that the Board erred in reversing her reinstatement. On cross-appeal, the University argues that the Board erred in affirming the reinstatement of Leonard and Perez. We affirm on the appeal and the cross-appeal.

The issues on appeal are: (1) whether section 10(b) of the Illinois Educational Labor Relations Act (115 ILCS 5/10(b) West 1996)) prohibits implementation of the arbitration awards; and (2) whether the arbitrators' awards reinstating Tomanek, Leonard, and Perez violate public policy.

## I. Facts

### A. Joyce Tomanek

Joyce Tomanek worked as a nurse in the University Hospital's "6W Stepdown" unit, which was a unit that monitored critical care patients. On December 16, 1995, Tomanek worked the night shift from 11 p.m. to 7:30 a.m. During that time, Tomanek was responsible for monitoring patient J.L., who required 21 cc of Dopamine per hour to maintain his blood pressure.

About four hours before Tomanek began her shift, a nurse hung a Dopamine bag for J.L. The nurse manager of 6W Stepdown testified that Tomanek should have easily calculated that the Dopamine bag would last until about 6 a.m. on December 17. The nurse manager also testified that nurses must order Dopamine at least 1 to 1½ hours in advance from the pharmacy, meaning that Tomanek should have ordered the Dopamine by 5 a.m. on December 17.

Tomanek did not order the Dopamine until 7:13 a.m. on December 17. When she placed her request with the pharmacy, she did not indicate that the request was an emergency or had a high priority.

Tomanek noted on J.L.'s chart that she had hung a new Dopamine bag. In fact, however, Tomanek left work at 7:30 a.m. without hanging a new Dopamine bag for J.L. At 8 a.m., the nurse on the next shift discovered the empty Dopamine bag and noted that J.L.'s blood pressure had plummeted.

Two days later, on December 19, 1995, Tomanek was again working the 11 p.m. to 7:30 a.m. shift at 6W Stepdown. During that time, Tomanek was responsible for monitoring patient H.S., who had a pacemaker. A computer monitor attached to H.S. generated "telemetry strips" which recorded the pacemaker's functioning.

At 11:13 p.m., the computer generated a telemetry strip indicating a "noncapturing pacemaker rhythm," *i.e.*, that the patient's heart was not beating regularly. According to University witnesses, Tomanek did not chart the noncapturing pacemaker rhythm. Instead, she charted that H.S. had anxiety, low blood pressure, and abdominal pain.

At approximately 11:50 p.m., Tomanek called the medical officer on duty (MOD) regarding H.S. According to the MOD, Tomanek did not mention H.S.'s irregular pacemaker rhythm. Instead, she told the MOD only that H.S. had low blood pressure, abdominal pain, and anxiety. Accordingly, the MOD prescribed Mylanta and Ativan (anti-anxiety medication.)

Between 11:13 p.m. and 12:45 a.m., the telemetry strips registered a noncapturing pacemaker seven times. The nurse manager testified that Tomanek failed to chart five of those telemetry strips. Tomanek testified in her defense that she thought that the prior shift's nurse had communicated information about the noncapturing pacemaker to the doctors responsible for H.S.'s care.

At about 3:30 a.m. on December 20, H.S. suffered a "code blue." Despite strenuous efforts by the entire medical team, H.S. died at about 4:30 a.m.

On September 13, 1996, the University began discharge proceedings against Tomanek. The University charged Tomanek with the following offenses: (1) endangering the lives of patients; (2) failure to report noncapturing pacemaker rhythm to a physician; (3) failure to notify an attending physician and nursing supervisor of a patient's condition on a timely basis; (4) failure to order medication on a timely basis; (5) failure to give ordered medication; (6) failure to follow doctor's orders; (7) failure to notice changes in a patient's condition; (8) falsification of a patient's medical chart; (9) negligent patient care; and (10) illegible documentation of a patient's record.

Tomanek's union grieved the discharge decision to arbitration. The arbitrator found that the University proved all charges except number 3. However, the arbitrator also found mitigating factors,

specifically that Tomanek was a senior nurse with a good work record and that no nexus existed between her actions and H.S.'s death. The arbitrator also found that Tomanek did not act intentionally nor was she grossly negligent.

The arbitrator determined that Tomanek should be reinstated without back pay, on the condition that the University transfer her to a less demanding position or retrain her to successfully function on 6W Stepdown.

The University refused to comply with the award. Tomanek's union then filed an unfair labor practice charge against the University. The Board found that the award reinstating Tomanek violated public policy because she had endangered the lives of two patients. Therefore, the Board reversed Tomanek's reinstatement.

## B. Linda Leonard

Linda Leonard worked as a University staff nurse for almost 20 years, mostly in the pediatric clinic. One of her coworkers, Mrs. J., worked in the pediatric clinic as an ambulatory care assistant.

On February 27, 1996, Mrs. J.'s son, M.J., appeared at his school with a bandage on his finger. During the course of the day, M.J. removed the bandage, revealing a V-shaped cut with dry blood. M.J. told his teacher that the cut was caused by a dog bite.

M.J.'s teacher sent him to the school nurse, who cleaned his finger and applied a new bandage. Concerned that the cut might be infected, the school nurse sent M.J. home with a note that he was not to return to school until a physician treated his finger.

The next day, February 28, M.J. returned to school with a note from his mother, Mrs. J., which stated that M.J. had not been bitten by a dog but instead had cut his hand on an open can in the refrigerator. Mrs. J. also stated in the note that M.J. did not need to see a physician.

At school that morning, M.J. pulled off his bandage, picked at the cut and complained that his finger hurt. M.J.'s teacher took him to the principal, who called Mrs. J. and told her that she needed to have M.J. seen by a physician.

Later that day, Mrs. J. took M.J. to the pediatric clinic and asked Linda Leonard to look at the cut on M.J.'s finger. Leonard, who was on her way to lunch at the time, examined M.J.'s finger and determined that the cut was not infected and that M.J. did not need to see a doctor. Leonard took M.J. to a treatment room and cleaned and covered his cut with a bandage.

Later that afternoon, after Leonard had returned from lunch, Mrs. J. approached Leonard and asked her to write a note authorizing

M.J. to return to school. Leonard agreed and filled out a form stating that M.J. "[w]as seen this afternoon for cut on finger." Leonard completed the form by signing the name of a physician at the clinic as well as her own name.

M.J. returned to school the next day and again picked off the bandage during class. M.J.'s teacher and principal observed more dried blood and "skin flap" on M.J.'s finger. M.J.'s teacher contacted the clinic to verify the authenticity of the doctor's note. The clinic administrators investigated and determined that M.J. had not been registered as a patient or seen by a physician. The principal told the clinic administrators that the school was considering reporting Mrs. J. to the Department of Children and Family Services (DCFS).

On March 4, 1996, M.J. was seen by a doctor at the clinic. The doctor cleaned M.J.'s cut and applied sterile strips.

On March 6, 1996, clinic personnel met with Leonard to discuss her treatment of M.J. At the meeting, Leonard denied any wrongdoing. The University began discharge proceedings against Leonard. The University charged Leonard with the following offenses: (1) failure to assure registration of a patient in the clinic; (2) failure to conduct and document nursing assessment; (3) failure to secure a physician to treat the patient; (4) treating the patient without authorization; (5) failure to communicate evaluation data of the patient to the appropriate member of the health care team; (6) signing a physician's name to the "return to school" slip without the patient being evaluated by the physician; and (7) failure to document the patient's chart.

Leonard's union grieved the discharge decision to arbitration. The arbitrator concluded that Leonard lacked the authority to treat M.J. and that she lacked the authority to sign a note indicating that a physician had treated M.J. The arbitrator also determined that Leonard failed to appreciate the seriousness of her conduct. However, the arbitrator also found that there was an informal practice at the clinic of extending courtesy visits to employees, relatives and friends and that it was not uncommon for relatives and friends to be seen and treated without being registered or billed. The arbitrator also found that Leonard was not aware of all the circumstances surrounding M.J.'s cut finger. Specifically, the arbitrator determined that Leonard was not aware that officials at M.J.'s school were concerned that the cut was infected. Leonard also was not aware that the school had ordered Mrs. J. to bring M.J. to a doctor, that Mrs. J. had initially refused, and that school officials contemplated contacting DCFS.

The arbitrator concluded that Leonard's conduct was not the type "which would justify the foregoing of positive progressive discipline and the imposition of immediate discharge in the case of a 20-year em-

ployee with no record of prior discipline." The arbitrator concluded that Leonard's conduct justified a 30-day suspension in lieu of discharge. The arbitrator ordered Leonard reinstated with back pay and benefits, except for pay and benefits lost during the 30 days of her suspension.

The University refused to comply with the award. Leonard's union then filed an unfair labor practice charge against the University. The Board affirmed Leonard's reinstatement.

## C. Diana Perez

Diana Perez worked as an admitting clerk in the University's department of pediatric dentistry. In June 1995, Perez's supervisor criticized her in front of a patient for incorrectly filling out a payment sheet. Angry at the public criticism, and believing that she had filled out the payment sheet correctly, Perez photocopied the payment sheet and sought a meeting with Dr. Fadavi, the clinic director of the department of pediatric dentistry.

The meeting was scheduled for 10 a.m. on June 8, 1995. Perez, Dr. Fadavi, and Ron Spannraft, an official from the personnel office, arrived on time. However, Perez's union representative failed to show, so Spannraft canceled the meeting. As everyone left, Perez handed Dr. Fadavi the payment sheet she had copied.

Later that afternoon, Dr. Fadavi asked Spannraft to look at the payment sheet because it appeared to be a copy of patient records. Dr. Fadavi and Spannraft then met with Perez, who explained that she copied the records in order to show that her supervisor had wrongly accused her of incorrectly filling out the patient payment sheet. Spannraft told Perez that the unauthorized copying of patient records constituted a violation of patient confidentiality.

On June 22, 1995, the University prepared documents initiating Perez's discharge based on her misconduct in copying patient records without authorization. Spannraft scheduled a 3 p.m. meeting on June 22 to discuss the charges against her. Perez was informed that she could have union representation at the meeting.

At approximately 2:20 p.m. on June 22, Perez went to Spannraft's office and told him that she was unable to secure a union representative for the meeting. Perez testified that Spannraft jumped to his feet and shook his fist at her while telling her that she was "going to be at that meeting with or without representation." Perez also testified that Spannraft shook his fist so close to her face that she "had to pull [her] head back so it wouldn't touch [her] nose." In contrast, Spannraft testified that he remained seated during the conversation and never raised his fist to her.

Later in the afternoon on June 22, Perez filed a police report regarding the incident with Spannraft. The next day, she filed a misdemeanor complaint alleging that Spannraft had committed an assault by waving his fist in her face and shouting at her.

On August 31, 1995, a trial was held on Perez's misdemeanor complaint. During the trial, Perez reiterated her claim that Spannraft had shaken his finger in her face and shouted at her. Spannraft denied Perez's charge. After hearing the evidence, the trial court found Spannraft not guilty of assault.

On September 19, 1995, the University initiated discharge proceedings against Perez. The University charged Perez with filing a false police report, filing a false misdemeanor complaint, and making false statements under oath.

Perez's union grieved the discharge decision to arbitration. The arbitrator agreed with the University that Perez's allegation of assault was not credible; however, the arbitrator determined that Perez was guilty of "exaggeration" rather than "blatant dishonesty." The arbitrator held that a 30-day suspension was appropriate punishment. The arbitrator ordered Perez reinstated with back pay and benefits, except for pay and benefits lost during the 30 days of her suspension.

The University refused to comply with the award. Perez's union then filed an unfair labor practice charge against the University. The Board affirmed Perez's reinstatement.

## II. Analysis of the University's Section 10(b) Argument

■ The University argues that the grievance-arbitration procedure set forth in Tomanek's, Leonard's, and Perez's collective bargaining agreements conflicts with the State Universities Civil Service Act (Civil Service Act) (110 ILCS 70/36o (West 1996)), which confers exclusive jurisdiction upon the University Civil Service Merit Board (merit board) to determine matters pertaining to the discharges of nonacademic University employees. The University argues that since the arbitration procedure conflicts with the Civil Service Act, the arbitration awards are unenforceable under section 10(b) of the Illinois Educational Labor Relations Act (115 ILCS 5/10(b) (West 1996)), which prohibits the implementation of provisions in a collective bargaining agreement that are "in violation of, or inconsistent with, or in conflict with any statute or statutes enacted by the General Assembly of Illinois." Since the construction of a statute is a matter of law, our review is *de novo. Peoples Gas Light & Coke Co. v. Illinois Commerce Comm'n*, 286 Ill. App. 3d 21, 23 (1996).

The appellate court addressed this same issue in *Board of Governors of State Colleges & Universities v. Illinois Educational*

*Labor Relations Board*, 170 Ill. App. 3d 463 (1988). In *Board of Governors*, Northeastern Illinois University (the employer) sought to discharge one of its nonacademic employees, Shellie Brown. The employer refused Brown's request to arbitrate the discharge decision and instead informed her that her only option was to appeal her discharge through the merit board. *Board of Governors*, 170 Ill. App. 3d at 467. After the merit board found cause for discharge, Brown's union filed an unfair labor practice charge over the refusal to arbitrate. *Board of Governors*, 170 Ill. App. 3d at 467.

The employer argued that the arbitration provision of the collective bargaining agreement conflicted with the Civil Service Act and therefore was unenforceable pursuant to section 10(b) of the Illinois Educational Labor Relations Act. *Board of Governors*, 170 Ill. App. 3d at 478. The court disagreed, concluding that although "the arbitration procedure is radically different from the civil service procedure, the mere fact that an alternative procedure exists does not mean the two systems conflict or are inherently inconsistent with each other. The existence of a separate procedural remedy for a discharged employee does not detract from the employee's rights but instead supplements them." *Board of Governors*, 170 Ill. App. 3d at 478. Since the arbitration provisions of the collective bargaining agreement supplemented Brown's civil service rights, the court held that the arbitration provisions were valid under section 10(b) of the Illinois Educational Labor Relations Act. *Board of Governors*, 170 Ill. App. 3d at 478.

The appellate court revisited the issue in *Board of Education of Rockford School District No. 205 v. Illinois Educational Labor Relations Board*, 258 Ill. App. 3d 859 (1994) (*Rockford I*). In *Rockford I*, the Rockford School District No. 205 (District) suspended a tenured teacher, Dr. Peter Wehrle (Wehrle), for fighting with some of his students. *Rockford I*, 258 Ill. App. 3d at 861. The District subsequently issued Wehrle a formal "notice to remedy," which stated that Wehrle would be discharged unless he remedied various deficiencies, including his use of excessive physical violence. *Rockford I*, 258 Ill. App. 3d at 862.

Wehrle filed a demand for arbitration, seeking to have the notice to remedy removed from his personnel file. *Rockford I*, 258 Ill. App. 3d at 862. The District filed a motion to dismiss alleging that it had the exclusive authority to determine the propriety of the issuance of a notice to remedy pursuant to sections 10—22.4 and 24—12 of the School Code (Ill. Rev. Stat. 1989, ch. 122, pars. 10—22.4, 24—12). *Rockford I*, 258 Ill. App. 3d at 863. The arbitrator denied the motion to dismiss and ordered the District to remove all material relating to the notice to remedy from Wehrle's personnel file. *Rockford I*, 258 Ill. App. 3d at 863.

The District refused to comply with the arbitrator's award. Accordingly, Wehrle's union filed an unfair labor practice charge. The Board ruled in favor of Wehrle, finding that the arbitrator's decision was binding. *Rockford I*, 258 Ill. App. 3d at 866.

The appellate court reversed. The court found that the arbitration award violated section 10(b) of the Illinois Educational Labor Relations Act because the award was contrary to sections 10—22.4 and 24—12 of the School Code, which gave school boards the *exclusive* authority regarding dismissals of tenured teachers. *Rockford I*, 258 Ill. App. 3d at 871-73.

The court distinguished its decision in *Board of Governors*, noting that the Civil Service Act contained no provisions similar to sections 10—22.4 and 24—12 that would prevent universities and their nonacademic employees from agreeing to grieve discharge proceedings to arbitration. *Rockford I*, 258 Ill. App. 3d at 871.

Thus, *Board of Governors* and *Rockford I* explicitly reject the University's argument here that the arbitrators' awards are in violation of, or inconsistent with, or in conflict with the Civil Service Act. The University argues, though, that the supreme court implicitly overruled *Board of Governors* in *Board of Education of Rockford School District No. 205 v. Illinois Educational Labor Relations Board (Rockford II)*, 165 Ill. 2d 80 (1995). We disagree. In *Rockford II*, the supreme court affirmed *Rockford I* without addressing, let alone criticizing, the *Board of Governors*' holding that arbitration of nonacademic civil service employee dismissals is permissible under the Civil Service Act and the Illinois Educational Labor Relations Act. Accordingly, we reject the University's suggestion that the supreme court impliedly or tacitly overruled *Board of Governors.*

The University argues that *Board of Governors* was decided under the so-called "specific statutory directive" test which was rejected by the supreme court in *Rockford II*. We need not analyze or discuss the "specific statutory directive" test, as a careful review of *Board of Governors* reveals that the appellate court there did not employ the specific statutory directive test in its analysis.

The University argues that the arbitrators' standard for dismissal will differ from merit board review and from the rules and regulations enacted by the merit board. The University is, in effect, rearguing that the merit board procedure set forth in the Civil Service Act is the exclusive means for addressing employee dismissal. As discussed, the University's argument is in error.

The University also cites *Nall v. International Ass'n of Machinists & Aerospace Workers, AFL-CIO, Local Lodge 822*, 307 Ill. App. 3d 1005 (1999), *Chicago School Reform Board of Trustees v. Illinois*

*Educational Labor Relations Board,* 309 Ill. App. 3d 88 (1999), and *City of Markham v. State & Municipal Teamsters, Chauffeur & Helpers, Local 726,* 299 Ill. App. 3d 615 (1998), in support of its argument that the arbitration awards here are unenforceable. In *Nall,* the court held that section 3—8002 of the Sheriff's Merit System Law (55 ILCS 5/3—8002 (West 1996)) prohibited parties from collectively bargaining over disciplinary and promotion decisions. In *Chicago School Reform Board,* the court held that the arbitrator's award reinstating a "full time basis" substitute teacher conflicted with the school board's exclusive authority to discharge the substitute teacher. In *City of Markham,* the court held that discipline of police officers was not a proper subject for bargaining due to the mandatory procedures for discipline set forth in the Illinois Municipal Code (65 ILCS 5/10—2.1—1 *et seq.* (West 1996)). *Nall, Chicago School Reform Board,* and *City of Markham* are inapposite to the present case, as they did not address the issue here, *i.e.,* whether the Civil Service Act prohibits arbitration of nonacademic civil service employee discharges. As discussed earlier in this opinion, we follow the *Board of Governors'* holding that the arbitration provisions are a permissible supplement to the employees' rights under the Civil Service Act.

### III. Analysis of the Public Policy Arguments

### A. Joyce Tomanek

■ Tomanek argues that the Board erred in reversing her reinstatement on public policy grounds; Tomanek asks this court to affirm the arbitrator's order of reinstatement. The court's review of an arbitrator's award is extremely limited. *American Federation of State, County & Municipal Employees v. State of Illinois,* 124 Ill. 2d 246, 254 (1988) (*AFSCME I*). A labor arbitration award must be enforced if the arbitrator acts within her scope of authority and the award draws its essence from the parties' collective bargaining agreement. *AFSCME I,* 124 Ill. 2d at 254. However, an arbitrator's award may not stand if it contravenes "paramount considerations of public policy." *AFSCME I,* 124 Ill. 2d at 260. The public policy must be " 'well-defined and dominant' and ascertainable 'by reference to the laws and legal precedents and not from generalized considerations of supposed public interests.' " *American Federation of State, County & Municipal Employees v. Department of Central Management Services,* 173 Ill. 2d 299, 307 (1996) (*AFSCME II*), quoting *W.R. Grace & Co. v. Local Union No. 759,* 461 U.S. 757, 766, 76 L. Ed. 2d 298, 307, 103 S. Ct. 2177, 2183 (1983). Accordingly, the public policy of a state must be determined by its constitution, laws, and judicial decisions. *AFSCME I,* 124 Ill. 2d at 260.

■ Thus, application of the public policy exception requires a two-step analysis. First, the court must identify a well-defined and dominant public policy. Second, the court must determine whether the arbitrator's award, as reflected in her interpretation of the collective bargaining agreement, violated the public policy. *AFSCME II*, 173 Ill. 2d at 307-08.

■ Here, the Board argues that the arbitrator's decision reinstating Tomanek violated the well-defined and dominant public policy favoring safe nursing care. The public policy favoring safe nursing care is evidenced by section 2 of the Illinois Nursing Act of 1987[1] (Nursing Act), then in effect, which states in relevant part:

"The practice of professional and practical nursing in the State of Illinois is hereby declared to affect the public health, safety, and welfare and to be subject to regulation and control in the public interest. It is further declared to be a matter of public interest and concern that the practice of nursing, as defined in this Act, merit and receive the confidence of the public and that only qualified persons be authorized to so practice in the State of Illinois." 225 ILCS 65/2 (West 1992).

The public policy favoring safe nursing care is further demonstrated by section 25(b)(4) of the Nursing Act (225 ILCS 65/25(b)(4) (West 1992)) (prohibiting behavior that demonstrates "incapacity or incompetency to practice under this Act"), and section 25(b)(7) of the Nursing Act (225 ILCS 65/25(b)(7) (West 1992)) (prohibiting "dishonorable, unethical or unprofessional conduct of a character likely to deceive, defraud or harm the public"). The policy favoring safe nursing care is further supported by a policy requiring truthful and accurate statements in documents connected with the nursing practice. See 225 ILCS 65/25(b)(18) (West 1992) (prohibiting the willful "making or filing [of] false records or reports in the licensee's practice as a nurse"); 225 ILCS 65/25(b)(21) (West 1992) (prohibiting the "use of any false, fraudulent, or deceptive statement in any document connected with the practice of nursing under this Act").

Having determined that a well-defined and dominant public policy in favor of safe nursing care exists, we next determine whether the arbitrator violated that public policy by reinstating Tomanek.

The arbitrator reinstated Tomanek despite finding that she failed to properly chart telemetry strips for the patient H.S.; failed to timely

---

[1]The Illinois Nursing Act of 1987 (225 ILCS 65/1 *et seq.* (West 1992)) was amended and renumbered by the Nursing and Advanced Practice Nursing Act (225 ILCS 65/5 *et seq.* (West 1998)), effective August 13, 1998. The provisions of the Illinois Nursing Act of 1987 at issue here remain substantively unchanged in the Nursing and Advanced Practice Nursing Act.

order a 20 ml bag of Dopamine for patient J.L.; charted that she had hung a replacement bag of Dopamine; credited on the patient's chart receipt of 250 ccs of Dopamine before the bag was received and hung; never hung the ordered bag; and left for the day without hanging a new bag.

Based on these factual findings, which are binding on the parties (*Board of Education of School District U-46 v. Illinois Educational Labor Relations Board*, 216 Ill. App. 3d 990, 997-98 (1991)), the arbitrator determined that Tomanek had violated the University's nursing standards by: (1) endangering the lives of patients H.S. and J.L.; (2) failing to order medication on a timely basis; (3) failing to give ordered medication; (4) failing to follow doctor's orders; (5) failing to notice a change in the patient's condition; (6) falsifying the patient's medical chart; and (7) committing negligent patient care.

The arbitrator's factual findings clearly establish that Tomanek has repeatedly failed to provide safe nursing care and that she has endangered patients' lives. Tomanek argues, though, that the arbitrator found that she could be trusted to refrain from any further offending conduct as long as the University transfers her to a less demanding position or retrains her to successfully function on 6W Stepdown. Tomanek cites the supreme court's statement in *AFSCME II*, 173 Ill. 2d at 322, that "as long as the arbitrator makes a *rational* finding that the employee can be trusted to refrain from the offending conduct, the arbitrator may reinstate the employee to his or her former job, and we would be obliged to affirm the award." (Emphasis added.)

■ Here, the arbitrator lacked a rational basis for reinstating Tomanek, as the evidence in the record does not support the arbitrator's finding that Tomanek would refrain from further offending conduct. In fact, the evidence was to the contrary, as the University presented five witnesses who testified that Tomanek had displayed an inattentive work attitude and below average nursing skills since 1991.

Tomanek also argues that no explicit provision in the Nursing Act mandates discharge for those who violate the Act. Tomanek's argument is irrelevant to the issue on appeal. The relevant question is whether Tomanek's reinstatement violates a well-defined and dominant public policy. Here, Tomanek jeopardized the lives of two patients in a three-day period; her reinstatement violates the public policy favoring safe nursing care as evidenced by sections 2, 25(b)(4), 25(b)(7), 25(b)(18), and 25(b)(21) of the Nursing Act. Accordingly, we affirm the Board's decision reversing Tomanek's reinstatement.

Tomanek argues that *AFSCME I* compels a different result. In *AFSCME I*, the arbitrator reinstated two mental health technicians who had been discharged by the Howe Developmental Center for leav-

ing the Center for an unauthorized trip to a flea market. *AFSCME I,* 124 Ill. 2d at 251. The court affirmed, noting that the employees' violation "did not result in any injury to or abusive treatment of a resident." *AFSCME I,* 124 Ill. 2d at 263.

*AFSCME I* is inapposite, as Tomanek's conduct endangered the lives of two of her patients and violated the public policy in favor of safe nursing care.

In her petition for reconsideration, Tomanek also cites *Eastern Associated Coal Corp. v. United Mine Workers of America, District 17,* 531 U.S. 57, 148 L. Ed. 2d 354, 121 S. Ct. 462 (2000), which was issued six days after we filed our opinion in the present case. In *Eastern Associated Coal Corp.,* a labor arbitrator ordered an employer to reinstate an employee truck driver who had twice tested positive for marijuana. *Eastern Associated Coal Corp.,* 531 U.S. at 59, 148 L. Ed. 2d at 359, 121 S. Ct. at 465. The issue before the Court was whether considerations of public policy required the lower courts to refuse to enforce that arbitration award. *Eastern Associated Coal Corp.,* 531 U.S. at 59, 148 L. Ed. 2d at 359, 121 S. Ct. at 465. The Supreme Court affirmed the arbitrator's reinstatement order, holding that there was no explicit, well-defined, or dominant public policy to which the arbitrator's decision was contrary. *Eastern Associated Coal Corp.,* 531 U.S. at 67, 148 L. Ed. 2d at 364, 121 S. Ct. at 469. By contrast, in the present case, the arbitrator's award reinstating Tomanek violates the public policy favoring safe nursing care. Accordingly, *Eastern Associated Coal Corp.* is inapposite.

## B. Linda Leonard

■ The University argues that the Board erred in affirming the arbitrator's award reinstating Leonard. The University argues that, like Tomanek, Leonard's reinstatement as a nurse violates public policy.

We disagree. Tomanek's reinstatement violated public policy because her misconduct endangered patients' lives and because the arbitrator lacked a rational basis for concluding that Tomanek would refrain from endangering lives in the future. Unlike Tomanek, Leonard's conduct (treating M.J.'s cut finger without registering him at the clinic and later signing a physician's name with her name to a return-to-school note) never endangered a patient's life. Further, Leonard's 20-year employment record without discipline supports the arbitrator's (implicit) determination that Leonard will refrain from the offending conduct in the future. Accordingly, the arbitrator's decision to reinstate Leonard does not violate public policy. We affirm the Board.

The University argues that *County of De Witt v. American Federation of State, County & Municipal Employees, Council 31*, 298 Ill. App. 3d 634 (1998), compels a different result. We disagree. In *De Witt*, the court reversed the arbitrator's decision reinstating an employee who had struck a resident of a nursing home in the head. The court determined that the arbitrator's award had improperly created a "one free hit" rule where employees may strike a resident without fear of termination. *De Witt*, 298 Ill. App. 3d at 638. The court also found that the arbitrator lacked a rational basis for his determination that the employee would refrain from future misconduct. *De Witt*, 298 Ill. App. 3d at 639. *De Witt* is factually inapposite, as Leonard never struck her patient; further, unlike *De Witt*, the record supports the arbitrator's finding that Leonard will refrain from the offending conduct in the future.

## C. Diana Perez

■ The University argues that the Board erred in affirming the arbitrator's award reinstating Perez. The University argues that Perez's reinstatement violates the well-defined and dominant public policy against perjury and malicious prosecution.

A person commits perjury "when, under oath or affirmation, in a proceeding or in any other matter where by law such oath or affirmation is required, he makes a false statement, material to the issue or point in question, which he does not believe to be true." 720 ILCS 5/32—2 (West 1996).

The University argues that Perez committed perjury at her trial against Spannraft. However, the University is bound by the arbitrator's factual finding that Perez did not willfully fabricate her testimony at trial. In the absence of a willful fabrication, Perez's testimony did not constitute perjury.

The absence of a willful fabrication also distinguishes this case from *Department of Central Management Services v. American Federation of State, County & Municipal Employees*, 245 Ill. App. 3d 87 (1993), and *AFSCME II*. In *Department of Central Management Services* and *AFSCME II*, the court reversed the reinstatement of DCFS employees for *deliberately* fabricating records; by contrast, Perez committed no deliberate fabrication here.

The University also argues that Perez committed malicious prosecution against Spannraft. The tort of malicious prosecution requires: (1) the commencement or continuation of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of *malice* on the part of defen-

534

dant; and (5) damages resulting to the plaintiff. *Turner v. City of Chicago*, 91 Ill. App. 3d 931, 934 (1980).

Malice is defined as "[t]he intent, without justification or excuse, to commit a wrongful act." Black's Law Dictionary 968 (7th ed. 1999).

Here, the arbitrator found that Perez's prosecution of Spannraft was not the *intentional* doing of a wrongful act. Accordingly, Perez did not commit the tort of malicious prosecution.

Since Perez did not commit perjury or malicious prosecution, her reinstatement does not violate any well-defined and dominant public policy. Therefore, we affirm the Board.

For the foregoing reasons, we affirm the Board.

Affirmed.

CAMPBELL, P.J., and GALLAGHER, J., concur.