# United States Court of Appeals
## For the First Circuit

No. 05-1525

THE MERCY HOSPITAL, INC.,

Plaintiff, Appellant,

v.

MASSACHUSETTS NURSES ASSOCIATION,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Michael A. Ponsor,  U.S. District Judge]
[Hon. Kenneth P. Neiman, U.S. Magistrate Judge]

Before

Boudin, Chief Judge,

Selya, Circuit Judge,

and Stahl, Senior Circuit Judge.

Edward J. McDonough, Jr., with whom Maurice M. Cahillane and
Egan, Flanagan and Cohen, P.C. were on brief, for appellant.
    Mark A. Hickernell, with whom Alan J. McDonald and McDonald &
Associates were on brief, for appellee.

November 21, 2005

**SELYA**, <u>Circuit Judge</u>. In this case, the district court confirmed an arbitration award that directed a hospital to reinstate an intensive-care nurse. The hospital, citing the pains that must be taken by health-care professionals to restrict the distribution of controlled substances, appeals on the ground that the reinstatement order transgresses public policy. After studying the matter, we agree with the district court that the arbitral award should be confirmed.

## I.  BACKGROUND

We start by rehearsing the underlying facts. We then limn what transpired before the arbitrator and the district court, respectively.

Plaintiff-appellant Mercy Hospital (the Hospital) operates an acute care hospital facility in Springfield, Massachusetts. Defendant-appellee Massachusetts Nurses Association (the MNA) is the authorized collective bargaining representative of the nurses who toil there. The Hospital and the MNA are (and were at all relevant times) parties to a collective bargaining agreement (CBA). The CBA recognizes the Hospital's right to "discipline or discharge employees for just cause" and establishes a multi-step grievance procedure, culminating in binding arbitration, for the resolution of employment-related disputes between the Hospital and the nurses.

The Hospital hired Nancy Dufault as a nurse in 1977. In the pertinent time frame (2001-2002), Dufault worked the twelve-hour night shift in the intensive care unit (ICU). Part of her responsibilities included administration of Ativan, morphine, and other controlled substances designed to relieve pain or anxiety. Dufault also served as a preceptor charged with ground-level oversight of fledgling ICU nurses (orientees).

Over her estimable quarter-century career, Dufault developed a reputation as an industrious, highly skilled nurse. In 1995, the Hospital gave her a special commendation for her service as a preceptor. Her last performance evaluation, prepared shortly before the events in question occurred, describes her as "a very strong expert critical care nurse" and remarks that she had exceeded hospital standards in a number of performance areas.

In the fall of 2001, storm clouds gathered. The Hospital revised its system for administering medication to ICU patients and installed an Omnicell machine in that unit. The machine functions as a computerized medicine cabinet. To obtain medication, a nurse must enter into an electronic keypad her personal code, the patient's personal code, the type of drug, and the dosage. The Omnicell processes this information and automatically unlocks the compartment housing the requested medication.

After administering the medicine to the patient, the nurse records the time, the identity of the drug, and the dosage in

-3-

a separate database known as SMS. Each night, a patient-specific medicine administration schedule (MAS) displaying the data entered into the SMS system is printed out and filed in the patient's chart. The purpose of this double-entry regime is to enhance the Hospital's ability to track and correlate requests for and administration of medications in the ICU.

In June of 2002 a nursing supervisor approached Dufault about a possible discrepancy in the dual entries for a patient in her care. The supervisor accepted Dufault's on-the-spot explanation and allowed the incident to pass without further inquiry.

The following month, the same supervisor detected what appeared to be inconsistencies between the Omnicell record and the MAS of one of Dufault's patients. The supervisor conducted an independent review of Dufault's entries into the Omnicell and SMS systems. Based on that review, the supervisor and a nurse who had assisted her concluded that, on a number of occasions, Dufault had withdrawn medication from the Omnicell without recording an offsetting entry for administration in the SMS system. They related their conclusions to the director of nursing, Mary Brown, who placed Dufault on administrative leave pending further investigation.

On August 27, 2002, Brown met with Dufault, an MNA representative, and the two nurses who had conducted the initial

review. Brown presented Dufault with the Omnicell and SMS printouts for five different patients and asked her to explain the inconsistences in her entries. With respect to an instance in which she had withdrawn eighteen milligrams of Ativan but had made no record of dispensing such a dose to the patient, Dufault stated that she had retrieved the unusually large quantity of Ativan so that she could prepare an intravenous drip bag and avoid having to return periodically to the Omnicell to obtain the smaller doses prescribed in the physician's orders. The other four instances dated back nearly two months, and Dufault complained that, without forewarning, she could not recall the particulars. She speculated, however, that incomplete documentation by her and an orientee probably explained the discrepancies. The meeting ended on that note.

Brown convened a second meeting two days later. She regarded Dufault's explanation of the discrepancy involving the eighteen milligrams of Ativan as implausible; the patient's intravenous drip had been discontinued several hours before Dufault withdrew the Ativan, and the physician's orders called for the drug to be injected rather than administered by intravenous drip. Dufault stood by her previous account. Brown then presented Dufault with two more alleged inconsistencies in her entries and served her with a termination notice. The stated reason for termination was: "Failure to adhere to the standards of

narcotic/controlled substance administration — suspected drug diversion."

Following Dufault's discharge, the MNA filed a grievance on her behalf. The parties eventually submitted two imbricated matters to binding arbitration: (i) whether there was just cause for Dufault's termination and (ii) if not, what consequences should ensue.

The arbitrator conducted an evidentiary hearing. She subsequently issued an opinion concluding that the preponderance of the evidence did not support the claim that Dufault had engaged in drug diversion but, rather, supported her repeated denials of culpability. In the arbitrator's view, Dufault's testimony that the discrepancies were most likely the result of documentation errors was worthy of belief for four reasons: (i) Dufault and other nurses testified credibly that they commonly caught up on their SMS entries during breaks or at the end of their shifts when they could not always remember the exact medications and dosages administered; (ii) Dufault's explanation of the probable cause of the discrepancies had remained consistent throughout the investigation and the grievance process; (iii) Dufault's testimony that ICU nurses occasionally deviated from established documentation protocols had "been more corroborated than rebutted" by the other evidence in the case; and (iv) there was absolutely no proof to substantiate the Hospital's accusation that the discrepancies in

the records were attributable to the diversion of drugs.[1]  The arbitrator also found that Dufault had received no formal training as a preceptor and that the Hospital had no established policy as to which nurse — the preceptor or the orientee — was responsible for documenting the medications administered to patients who were under their joint care.

With specific reference to the Ativan incident, the arbitrator accepted the testimony of two non-party witnesses that it was common practice for ICU nurses to prepare intravenous drip bags well in advance of the time when they would be needed (either for use during their own or succeeding shifts).  The arbitrator also credited testimony that although it was not good practice, a nurse might deviate from a doctor's orders and administer medication intravenously rather than by syringe as a time-saving device.

On the basis of these findings, the arbitrator concluded in pertinent part:

> The Hospital failed to carry its burden . . . in this matter.  The preponderance of the evidence in the record supports [Dufault's] denial of any culpability with respect to the Hospital's charges of drug diversion. . . . [Dufault] credibly testified as to what she believed were the most likely actions she took (or did not take) with respect to the narcotics she removed from the Omnicell . . .

---

[1]In this vein, the arbitrator noted that Dufault had submitted to three drug tests, each of which had proved negative for the presence of Ativan, morphine, or any other controlled substance.

. In light of the Hospital's failure to submit a preponderance of evidence that contradicts [Dufault's] account, . . . the termination . . . is found to be without just cause.

The arbitrator then moved to the remedy question and, taking into account the idiosyncratic facts of the case, ordered the Hospital to reinstate Dufault with back pay and without any loss of seniority.

The Hospital was not pleased. It asked the federal district court to vacate the award on the ground that reinstating Dufault would violate public policy. The MNA cross-filed for confirmation of the award. The district judge referred the case to a magistrate judge, see 28 U.S.C. § 636(b)(1)(B), who recommended confirmation. On de novo review, see Fed. R. Civ. P. 72(b), the district judge adopted the magistrate judge's recommendation and entered judgment for the MNA.[2] This timely appeal ensued.

## II. ANALYSIS

Where, as here, the employer and the union have bargained for an arbitrator's construction of a CBA, a court's authority to vacate an arbitral award is closely circumscribed. Boston Med. Ctr. v. SEIU, Local 285, 260 F.3d 16, 21 (1st Cir. 2001); Teamsters Local Union No. 42 v. Supervalu, Inc., 212 F.3d 59, 65 (1st Cir.

---

[2]For simplicity's sake, we do not distinguish hereafter between the magistrate judge and the district judge but, rather, take an institutional view and refer to the determinations below as those of the district court. See, e.g., United States v. Maldonado, 356 F.3d 130, 134 n.1 (1st Cir. 2004).

2000). Thus, a party who challenges an arbitrator's award in the labor-management context must be prepared to undertake a steep uphill climb. Typically, the challenge will fail if the award "draws its essence from the collective bargaining agreement" rather than from the arbitrator's "own brand of industrial justice." USW v. Enter. Wheel & Car Corp., 363 U.S. 593, 597 (1960). "[A]s long as the arbitrator is even arguably construing or applying the contract," the fact that he or she may have made a mistake — even a serious mistake — will not afford a basis for defenestrating the award. United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 38 (1987). That remains true whether the mistake concerns a matter of fact or a matter of law. Id.

There are, however, a few exceptions to the general rule that the arbitrator has the last word. See 9 U.S.C. § 10(a) (codifying certain exceptions); Supervalu, 212 F.3d at 66 (discussing other exceptions). One such exception, which traces its roots to the common law doctrine that courts may refuse to enforce illegal contracts, holds that a court may vacate an arbitral award that violates public policy. W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber Workers, 461 U.S. 757, 766 (1983). This exception is narrow. The mere fact that "general considerations of supposed public interests" might be offended by an arbitral award is not enough to make the exception available. Id. (citation and internal quotation marks omitted).

Rather, the award must violate an "explicit . . . well defined and dominant" public policy, as ascertained "by reference to . . . laws and legal precedents." Id. (citations and internal quotation marks omitted).

In the context of an arbitration award that reinstates a fired employee, the question is not whether the charged conduct offends public policy or whether some remedy short of unconditional reinstatement (say, a probationary period or a suspension without pay) might have been preferable. Rather, the sole question is whether the award itself — the order for reinstatement — gives offense. See E. Assoc'd Coal Corp. v. UMW, Dist. 17, 531 U.S. 57, 62-63 (2000). We turn, then, to that question and ask whether the order to reinstate Dufault as an ICU nurse contravenes some explicit, well-defined, and dominant public policy as ascertained by reference to the positive law of Massachusetts (which, of course, includes applicable federal law). See id.

This inquiry is not free-form. In determining whether Dufault's reinstatement contravenes Massachusetts's declared public policy, we cannot forget that the parties, through the collective bargaining process, chose arbitration as the preferred means of resolving workplace disputes. Accordingly, we must read the pertinent statutes and regulations "in light of background labor law policy that favors determination of disciplinary questions

through arbitration when chosen as a result of labor-management negotiation." Id. at 65.

The Hospital relies on federal and state statutes and a state regulatory scheme to undergird its claim that Massachusetts has an explicit, well-defined, and dominant public policy in favor of restricting the distribution of controlled substances. See generally 21 U.S.C. §§ 801-971; Mass. Gen. Laws ch. 94C. It notes that these provisions collectively establish strict controls on the handling of controlled substances and evince a strong concern for preventing the unauthorized distribution of such substances by health-care professionals. Zeroing in on the facts of this case, the Hospital emphasizes that the state's regulations governing the licensure of nurses set out strict standards of conduct with respect to the administration of controlled substances. See 244 Mass. Code Regs. 9.03. Pertinently, those regulations require nurses to (i) comply with the Controlled Substances Act, Mass. Gen. Laws ch. 94C; (ii) maintain the security of controlled substances; (iii) refrain from unlawfully obtaining or possessing controlled substances; (iv) administer drugs only as prescribed; and (v) document the handling, administration, and destruction of controlled substances. 244 Mass. Code Regs. 9.03(6)(a)(8), (35), (37), (38), (39).

Building on this elaborate foundation, the Hospital asserts that Dufault breached the regulations by diverting drugs

-11-

away from patients, by failing properly to document the dispensation of medications, and by administering Ativan through a medium other than that prescribed in the physician's orders. Consequently, the Hospital says, the arbitrator's award offends public policy because it reinstates a serial regulatory violator to a highly sensitive position.

The principal problem with this line of argument is that it ignores the arbitrator's resolution of disputed issues. With a few limited exceptions not relevant here, an inquiring court is bound by an arbitrator's findings of fact. See El Dorado Tech. Servs., Inc. v. Union Gen. De Trabajadores, 961 F.2d 317, 320 (1st Cir. 1992). Once due deference is accorded to the arbitrator's factual findings here, the Hospital's argument withers.

The Hospital suggests that the arbitrator glossed over Dufault's unauthorized diversion of drugs and that even accidental diversion is serious business. After stuffing this straw man, the Hospital proceeds to shred it, telling us that because Dufault improperly diverted drugs in contravention of the state regulatory scheme, reinstating her to a sensitive position violates public policy. This construct overlooks that the arbitrator, far from glossing over the discrepancies in the Omnicell and SMS records, explicitly found that the Hospital had failed to prove that Dufault diverted any drugs away from patients. Thus, even if the mandated reinstatement of a nurse found to have deliberately diverted drugs

-12-

might violate an explicit, well-defined, and dominant public policy — and we intimate no view as to whether such a policy has been established — the mandated reinstatement of a nurse who has been exonerated of all charges of intentional drug diversion, such as Dufault, plainly would not. Cf. Misco, 484 U.S. at 44 (refusing to vacate a reinstatement order when the employer had failed to prove its allegations of employee misconduct).

The Hospital's attempts to tease a violation of public policy out of Dufault's documentation errors and her use of an unauthorized method of administering Ativan are equally unconvincing. It argues that failure properly to account for controlled substances, even if not deliberate, is nevertheless a grave matter. While we agree with that premise — Dufault's conduct seems to have violated the Massachusetts nursing regulations, see, e.g., 244 Mass. Code Regs. 9.03(38)-(39) — we do not accept the Hospital's conclusion that this fact somehow undermines the reinstatement order. After all, this appeal tests only whether the reinstatement award, on the facts as found by the arbitrator, contravenes an explicit, well-defined, and dominant public policy. See E. Assoc'd Coal, 531 U.S. at 62-63. Once the issue is framed in that manner, it becomes nose-on-the-face plain that the Hospital has failed to establish any barrier at all to Dufault's reinstatement.

Indeed, the Hospital has not identified a single iteration of positive law that prohibits the reinstatement of a nurse who, without causing injury to patients, made a few documentation errors or deviated slightly from doctors' orders on a single occasion in a long and distinguished career. This failure strongly suggests that the reinstatement order does not violate public policy. See id. at 66 (relying heavily on the fact that the reinstatement order did not violate a "specific provision of any law or regulation" in concluding that the order did not run contrary to public policy); Boston Med. Ctr., 260 F.3d at 25 (similar).

To be sure, there is reason to believe that an employer is not invariably required to point to a specific provision of positive law in order to bring a case within the ambit of the public policy exception. See E. Assoc'd Coal, 531 U.S. at 63 (dictum). But cf. id. at 67-69 (Scalia, J., concurring) (questioning this view). In a prior case in which a reinstatement order did not breach a specific provision of positive law, we required the employer to show that the reinstatement order subsumed employee conduct so egregious that resumed employment would offend some deep-rooted public policy. See Boston Med. Ctr., 260 F.3d at 25. That precedent does not advance the Hospital's cause.

In endeavoring to make the showing that Boston Medical Center requires, an employer cannot relitigate the facts as found

-14-

by the arbitrator.  See Misco, 484 U.S. at 44-45.  In this case, based largely on the testimony of the Hospital's own witnesses, the arbitrator found that Dufault was a competent, hard-working nurse who had exceeded her employer's standards for many years; that neither Dufault's documentation bevues nor the single instance of her improper administration of Ativan had caused any harm to patients; that her explanation for the discrepancies in the records was credible; and that, in all events, there was no evidence of missing medication, let alone drug diversion.  The arbitrator did not find that Dufault posed a risk of harm to patients, that she was incapable of properly documenting the administration of medication, or that she had displayed a pattern of failing to comply with doctors' orders.

    We are constrained to credit the various parts of this factual assessment.[3]  El Dorado Tech. Servs., 961 F.2d at 320. Doing so, we find no principled basis for concluding that Dufault's underlying conduct was such as to render her reinstatement offensive to public policy.  See MidMich. Reg'l Med. Ctr. — Clare v. Prof'l Employees Div. of Local 79, SEIU, 183 F.3d 497, 504 (6th Cir. 1999) ("Even highly skilled professionals err on occasion, and we think it clear that it cannot violate . . . public policy . . .

---

[3]We note, in passing, that this assessment does not seem to be chimerical.  During the pendency of this appeal, the Massachusetts Board of Registration in Nursing dismissed the Hospital's complaint against Dufault for insufficient evidence.

to contract to retain a nurse guilty of committing some acts of carelessness.").

In arguing for the opposite result, the Hospital relies on a trio of decisions that vacated reinstatement awards under the public policy exception. See Russell Mem'l Hosp. Ass'n v. USW, 720 F. Supp. 583 (E.D. Mich. 1989); City of Boston v. Boston Police Patrolmen's Ass'n, 824 N.E.2d 855 (Mass. 2005); Ill. Nurses Ass'n v. Bd. of Trs. of Univ. of Ill., 741 N.E.2d 1014 (Ill. 2001). A court must be wary of reliance on precedents which, like these three decisions, involve state policies different than the one at issue. See Boston Med. Ctr., 260 F.3d at 25 n.7 (disregarding the plaintiff's citation of "conclusions of other courts that the public policies of other states forbid the reinstatement of an employee" in factually dissimilar cases). At any rate, the cases cited by the Hospital are readily distinguishable. In each of them, the affected employee committed acts far more blameworthy than those that the arbitrator attributed to Dufault. See Russell Mem'l Hosp., 720 F. Supp. at 587 (involving a nurse who was guilty of negligence and insubordination and who had "a propensity for misconduct"); Boston Police, 824 N.E.2d at 859 (involving a police officer who had intentionally filed false charges and then committed perjury); Ill. Nurses, 741 N.E.2d at 1023-24 (involving an "inattentive . . . [and] . . . below average" nurse who had

-16-

endangered the lives of two patients, intentionally falsified a patient's chart, and provided negligent care).

A much more instructive case is Boston Medical Center, in which an arbitrator ordered the reinstatement of a nurse whose slipshod care had resulted in a patient's death. 260 F.3d at 18-20. Relying on the nurse's unblemished ten-year work record and the arbitrator's finding that she had not "willfully or callously provided substandard care," we concluded that the reinstatement order did not transgress Massachusetts's public policy. Id. at 25. The facts in the instant case are considerably more favorable to the employee than the facts in Boston Medical Center; after all, the arbitrator determined not only that Dufault had achieved an exemplary twenty-five-year nursing career but also that her relatively minor miscues had not threatened the welfare of any patients.

Our refusal to vacate the reinstatement order in Boston Medical Center adumbrates the result we must reach here: upholding the district court's confirmation of the arbitrator's reinstatement order. While a single documentation or dispensing error may contravene the state's nursing regulations, not every such error or set of errors necessarily furnishes just cause for termination of a nurse's employment. Context is important. Here, the nature of the errors, the employee's history, the lack of any harm to

patients, and the other circumstances as found by the arbitrator persuade us that reinstatement is not an affront to public policy.[4]

## III.   CONCLUSION

We need go no further.   In this matter, the arbitrator supportably found that the Hospital had cashiered Dufault without just cause and ordered her reinstatement.   The Hospital's attempt to upset that award is unavailing: although an employer may secure vacation of an arbitrator's reinstatement order in the rare case in which the employer can show that the order itself transgresses an explicit, well-defined, and dominant public policy, the Hospital has wholly failed to bring this case within the isthmian confines of that doctrine.

We understand and appreciate the Hospital's concern with accountability for dangerous drugs.   Each case, however, must be judged on its own facts.   Here, the arbitrator appears to have weighed that concern in the balance.   Given the idiosyncratic facts of the case, we are not at liberty to disturb her decision.   What may transpire in different circumstances or if Dufault proves to be a repeat offender is, of course, an open question.

---

[4]At oral argument in this court, the Hospital suggested for the first time that the arbitrator erred in not imposing some lesser penalty once she found discharge unwarranted.  This argument was not made in the district court and is, therefore, not properly before us.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).  In all events, the sole question raised by this appeal is whether the reinstatement order offends public policy.  That does not encompass the question of whether the imposition of some remedy short of unconditional reinstatement might have been desirable.

**Affirmed**.