Public Employee Labor Relations Board
No. 2006-525

APPEAL OF MERRIMACK COUNTY
(New Hampshire Public Employee Labor Relations Board)

Argued: April 19, 2007
Opinion Issued: August 23, 2007

*Atlas & Atlas, P.C.*, of Nashua (*Susan A. Atlas* on the brief and orally), for the petitioner.

*Backus, Meyer, Solomon & Branch, LLP*, of Manchester (*Jon Meyer* and *Ellen Purcell* on the brief), and *International Chemical Workers Union Council/United Food & Commercial Workers, Local 1046C*, of Akron, Ohio (*Randall Vehar*, assistant general counsel, on the brief and orally), for the respondent.

DALIANIS, J. The petitioner, Merrimack County (county), appeals and the respondent, International Chemical Workers Union Council/United Food & Commercial Workers, Local 1046C (union), cross-appeals a decision of the New Hampshire Public Employee Labor Relations Board (PELRB) ordering the county to implement an arbitrator's award mandating reinstatement of an employee represented by the union. We affirm in part, vacate in part and remand.

The record supports the following: The county is a public employer within the meaning of RSA 273-A:1, X (Supp. 2006). The union is the exclusive bargaining representative for certain workers at the county's nursing home. The county and the union were signatories to a collective bargaining agreement (CBA). Particularly relevant to this appeal are articles 1, 2, 24 and 25 of the CBA:

- Article 1 contained the parties' agreement that "any rights, duties or authority existing by virtue of the New Hampshire Revised Stat[ut]es Annotated or other law shall in no way be abridged or limited" by the CBA and that, to the extent that any CBA provision was inconsistent with "any such law, the provision(s) of law shall prevail."

- Article 2 gave the county the exclusive right to manage the nursing home, including the right to discipline or discharge employees, "[e]xcept as specifically limited or abridged by the terms of [the CBA]."

- Article 24 provided that "[r]esident abuse/neglect/exploitation" would not be tolerated and that "[a]ny instance of physical, verbal, mental or medical abuse/neglect/exploitation of any resident shall be grounds for immediate termination."

- Article 25 contained grievance and arbitration procedures. In the case of arbitration, this article provided that the arbitrator's decision would be "final and binding" if it was "within the scope of authority and power of the Arbitrator set forth within this Agreement." This article also provided: "The function of the Arbitrator is to determine the interpretation of the specific provisions of this Agreement. It

is agreed that the arbitrator shall have no authority to add to, subtract from, or modify any terms of this agreement."

The CBA expired on March 31, 2002; the parties did not enter into a new CBA until after the events herein described.

Beginning in May 1999, the county employed Melissa Foote as a resident assistant, and later as a licensed nursing assistant (LNA), at the nursing home. Foote also served as a shop steward for the union, participating in contract negotiations and representing bargaining unit members.

On October 28, 2002, Foote was working at the nursing home where her duties included performing safety checks on certain nursing home residents every half hour and responding to their calls. At approximately 2:30 p.m., two LNAs found one of the residents sitting in his wheelchair. He had defecated. One LNA thought that the resident should be wearing an adult diaper, but the other was unsure. Foote, as the LNA primarily responsible for this resident, was called to answer this question. Foote responded to the resident's accusation that she had not attended him by pointing a finger in his face and yelling, or loudly interrupting him, to emphasize what she had done that day. Ultimately, this incident was reported to the assistant director of nursing at the nursing home, who filled out a complaint form, asked a social worker to interview the resident, and called Foote and a union representative to her office to discuss what had happened. It was also reported to the New Hampshire Department of Health and Human Services (DHHS).

Based upon recommendations from the administrator and assistant administrator of the nursing home, the county's board of commissioners voted to terminate Foote's employment effective November 23, 2002. The administrator testified that he based his recommendation, at least in part, upon Foote's refusal to admit to wrongdoing. The union then filed a grievance on Foote's behalf.

The parties proceeded to arbitration. The arbitration issue to which they stipulated was: "Whether there was just cause for the County to terminate Ms. Foote under the collective bargaining agreement? If not, what shall the remedy be?" In its brief to the arbitrator, the county agreed that "under RSA 28:10-a, County employees who have been employed for more than one year are entitled to a 'good cause' standard of discharge." According to that brief, the county further agreed that "good cause would be examined under traditional just cause standards."

After five days of hearing, the arbitrator found that while Foote had not neglected the resident, she had verbally abused him. The arbitrator further found, however, that her conduct "was no more serious than

employees who have continued to work at the Nursing Home," and that had Foote admitted to having verbally abused the resident, she would not have been terminated. Therefore, the arbitrator found that terminating Foote was an "overly harsh and unreasonable penalty" for which the county lacked just cause. The arbitrator ordered the county to reinstate Foote, without back pay or other lost benefits, conditioned upon Foote's taking anger management and abuse/neglect training programs. The county refused to reinstate Foote, prompting the union to file an unfair labor practice charge with the PELRB. The county filed a counterclaim alleging that the union had engaged in an unfair labor practice by demanding Foote's reinstatement. Specifically, the county asserted that the arbitrator's award was void and unenforceable because it exceeded his authority under the CBA and because it violated public policy. The PELRB ruled in the union's favor. This appeal and cross-appeal followed.

When reviewing a decision of the PELRB, we defer to its findings of fact, and, absent an erroneous ruling of law, we will not set aside its decision unless the appealing party demonstrates by a clear preponderance of the evidence that the order is unjust or unreasonable. *Appeal of Nashua Police Comm'n*, 149 N.H. 688, 689 (2003); *see also* RSA 541:13 (2007). Though the PELRB's findings of fact are presumptively lawful and reasonable, we require that the record support its determinations. *Appeal of City of Laconia*, 150 N.H. 91, 93 (2003).

I

The county first argues that the PELRB erred by enforcing the arbitrator's award because the award exceeded the arbitrator's authority and, therefore, was not final and binding. "A judicial challenge to arbitral authority requires the reviewing court to consider both the CBA and the arbitral submission." *Larocque v. R.W.F., Inc.*, 8 F.3d 95, 96 (1st Cir. 1993); *see Appeal of Police Comm'n of City of Rochester*, 149 N.H. 528, 534 (2003) (extent of arbitrator's jurisdiction is determined by parties' agreement to arbitrate; parties may agree to submit even question of arbitrability to arbitrator); *Local 238 Intern. Broth. Teamsters v. Cargill, Inc.*, 66 F.3d 988, 991 (8th Cir. 1995) ("Once the parties have gone beyond their promise to arbitrate and have actually submitted an issue to an arbiter, we must look both to their contract and to the submission of the issue to the arbitrator to determine his authority." (quotation omitted)). "[T]he overriding concern is whether the contracting parties have agreed to arbitrate a particular dispute, not whether the agreement is within the CBA." *Appeal of Police Comm'n of City of Rochester*, 149 N.H. at 534 (quotation and citation omitted).

■ While ordinarily we interpret contractual provisions *de novo*, *see Appeal of Town of Durham*, 149 N.H. 486, 487 (2003), "the general rule [is] that the interpretation of a CBA is within the province of the arbitrator, subject to certain exceptions recognized by our case law" that are not relevant here. *Appeal of State of N.H.*, 147 N.H. 106, 109 (2001); *see Appeal of City of Manchester*, 153 N.H. 289, 294 (2006) (where PELRB had authority to interpret CBA to determine whether claim was arbitrable, we review PELRB's interpretation of CBA *de novo*); *Appeal of Town of Durham*, 149 N.H. at 487-88 (same). "[W]hen the parties include an arbitration clause in their CBA, they choose to have disputes concerning constructions of the CBA resolved by the arbitrator." *Appeal of State of N.H.*, 147 N.H. at 109 (quotation and brackets omitted). "Because the parties have contracted to have disputes settled by an arbitrator chosen by them rather than by a judge, it is the arbitrator's view of the facts and of the meaning of the contract that they have agreed to accept." *Paperworkers v. Misco, Inc.*, 484 U.S. 29, 37-38 (1987); *see Keebler Co. v. Truck Drivers, Local 170*, 247 F.3d 8, 10 (1st Cir. 2001). For this reason, the PELRB does not regularly have jurisdiction to interpret the CBA when it provides for final and binding arbitration. *Appeal of State of N.H.*, 147 N.H. at 108.

■ Our review of the arbitrator's interpretation of the CBA is similarly limited. *See Georgia-Pacific Corp. v. Local 27*, 864 F.2d 940, 944 (1st Cir. 1988). Just as the court may not reject the arbitrator's factual findings simply because it disagrees with them, neither may the court reject the arbitrator's interpretation of the CBA simply because the court disagrees with it. *See Misco*, 484 U.S. at 38. While the arbitrator cannot ignore the plain language of the CBA, because the parties authorized the arbitrator to give meaning to that language, "a court should not reject an award on the ground that the arbitrator misread the contract." *Id.* "[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." *Id.*; *see Georgia-Pacific Corp.*, 864 F.2d at 944. The court's task is thus "ordinarily ... limited to determining whether the arbitrator's construction of the [CBA] is to any extent plausible." *Exxon Corp. v. Esso Workers' Union, Inc.*, 118 F.3d 841, 844 (1st Cir. 1997), *abrogated on other grounds by Eastern Associated Coal Corp. v. United Mine Workers*, 531 U.S. 57 (2000). "[A]n arbitrator's view of the scope of the issue is entitled to the same deference normally accorded to the arbitrator's interpretation of the collective bargaining agreement." *Larocque*, 8 F.3d at 97 (quotation and ellipses omitted); *see Pelletier v. Auclair Transp. Co.*, 109 N.H. 302, 304 (1969).

In looking to the parties' submission, which asked the arbitrator to decide whether the county had "just cause" to terminate Foote and, if not, to formulate a remedy, and in light of the parties' expired CBA, which did not reference "just cause," the arbitrator determined that the "traditional just cause standard" applied to his review of the county's decision. Under this standard, "the arbitrator ... has the authority to consider the underlying issues and surrounding circumstances necessary to interpret and apply the express provisions of the CBA and reach a final decision." *Appeal of City of Manchester*, 153 N.H. at 293. The United States Supreme Court has identified seven criteria for analyzing whether just cause exists: (1) the reasonableness of the employer's position; (2) the notice given to the employee; (3) the timing of the investigation undertaken; (4) the fairness of the investigation; (5) the evidence against the employee; (6) the possibility of discrimination; and (7) the relation of the degree of discipline to the nature of the offense and the employee's past record. *Misco*, 484 U.S. at 34 n.5; *see Appeal of City of Manchester*, 153 N.H. at 293 (citing seven criteria with approval). Consistent with this standard, the arbitrator examined whether Foote's conduct warranted the maximum penalty under the CBA, and determined that it did not.

We cannot say that the arbitrator's interpretation of the CBA and the parties' submission is so implausible as to require reversal. *See Misco*, 484 U.S. at 38. Nor can we say that the county has demonstrated by a clear preponderance of the evidence that the PELRB's decision to uphold this interpretation is either unjust or unreasonable. *See Appeal of Nashua Police Comm'n*, 149 N.H. at 689. "By requesting that the arbitrator determine whether [the county] had just cause to discharge [Foote], both parties conferred authority upon the arbitrator to decide that issue." *Homestake Min. Co. v. United Steelworkers*, 153 F.3d 678, 680 (8th Cir. 1998) (quotation and brackets omitted). Having been asked whether there was just cause to terminate Foote and, if not, to provide a remedy, "[t]he arbitrator was free to conclude that there was no just cause for discharging [Foote], but that there was just cause for a lesser discipline." *Boston Medical v. Service Employees, Local 285*, 260 F.3d 16, 22 (1st Cir. 2001), *cert. denied*, 534 U.S. 1083 (2002).

Our conclusion is consonant with the decisions of other courts. *See id.* (citing cases). In *Bureau of Engraving v. Graphic Communication International Union*, 284 F.3d 821, 823-24 (8th Cir. 2002), for instance, as here, the arbitrator ordered the employer to reinstate an employee who had been terminated for accruing thirteen unexcused absences. Unlike the CBA at issue here, the CBA in *Bureau of Engraving* included a just cause provision. *Bureau of Engraving*, 284 F.3d at 824. It did not, however, state

that thirteen unexcused absences constituted just cause. *Id.* at 825. As did the parties in this case, the parties in *Bureau of Engraving* framed the issue for the arbitration as: "Whether the Employer had just cause to terminate the employment of the grievant . . . , and if not, what should be the remedy?" *Id.* at 824 (quotation omitted). The arbitrator concluded that although the employee had accrued thirteen absences, the employer lacked just cause for terminating her. *Id.*

On appeal, the employer contended that the arbitrator had exceeded his authority by ignoring the plain language of the attendance policy, which provided that the remedy for thirteen unexcused absences was termination, and by conducting a just cause analysis. *Id.* The court ruled that the parties' submission conferred authority on the arbitrator to conduct a just cause analysis and that the arbitrator's interpretation of the submission was reasonable. *Id.* at 825. As the court explained: "For reasons known only to it, [the employer] agreed to stipulate to the just cause analysis. . . . Having entered into the just cause stipulation, it is disingenuous for [the employer] to argue now that the arbitrator acted improperly by conducting the very analysis [the employer] asked it to undertake." *Id.*; *see Homestake Min. Co.*, 153 F.3d at 680 (where employer requested arbitrator to determine whether employer had just cause to discharge employee, employer cannot argue that arbitrator lacked authority to decide this issue); *Cargill, Inc.*, 66 F.3d at 990-91 (same).

Similarly, here, having agreed that the arbitrator would apply "traditional just cause standards" and, in its brief to the arbitrator, having itself analyzed the decision to terminate Foote under those standards, the county cannot argue now that the arbitrator acted improperly by analyzing just cause as he did. In its brief to the arbitrator, the county conceded that "for the purposes of this arbitration, good cause would be examined under traditional just cause standards or principles." In keeping with this concession, the county argued that: the CBA permitted the county to discharge Foote; Foote's conduct could not be tolerated; Foote knew or should have known that her conduct would result in discharge; Foote was not entitled to progressive disciplinary or corrective action as such action would have been futile; Foote was not discharged because of anti-union bias; Foote was not disparately treated; and no mitigating circumstances existed that would warrant reducing Foote's termination to a lesser sanction. In short, the county argued the seven criteria set forth in *Misco*, 484 U.S. at 34 n.5. Having itself analyzed its decision to terminate Foote under traditional just cause principles, the county cannot fault the arbitrator for engaging in the same analysis.

The county argues that under articles 2, 24 and 25 of the CBA, once the arbitrator found that Foote had verbally abused the resident, he lacked

the authority to disagree with the county's decision to terminate her. *See Poland Spring Corp. v. United Food, Local 1445*, 314 F.3d 29, 35 (1st Cir. 2002), *cert. denied*, 540 U.S. 818 (2003). To the county, once the arbitrator found that Foote committed an act listed in the CBA as "grounds for immediate termination," he was "not free to fashion a separate remedy apart from the one provided in the parties' agreement." *Id.* at 34.

The county also contends, contrary to its argument before the arbitrator, that the parties' submission did not ask the arbitrator to apply traditional just cause principles, but rather to apply the CBA's implied definition of "just cause." While the county concedes that the CBA "was silent with respect to the articulation of a just cause standard," the county asserts that "the mere existence of a collectively bargained labor agreement mandates that the employer ... demonstrate 'cause,' 'just cause' or 'good cause.'" Thus, according to the county, the reference in Article 24(B) to "grounds for termination" was akin to a reference to "just cause," and that under this provision, terminating an employee for verbally abusing a resident constituted *per se* just cause. *See Georgia-Pacific Corp.*, 864 F.2d at 945.

To support its assertions, the county relies upon *Georgia-Pacific Corp.*, 864 F.2d at 945-46, and *Poland Spring Corp.*, 314 F.3d at 34-35. Both of these cases are distinguishable from this case. The CBAs in those cases unambiguously provided that employees could not be terminated except for just cause and expressly included the employee's act within the definition of just cause. *See Georgia-Pacific Corp.*, 864 F.2d at 942; *Poland Spring*, 314 F.3d at 31. The CBA in the instant appeal does not even use the phrase "just cause." The instant case is, thus, unlike *Georgia-Pacific Corp.* and *Poland Spring*, which stand "for the proposition that, once an arbitrator finds that an employee committed some act specifically listed in the [CBA] as providing just cause for termination, the arbitrator is not free to determine that the act does not warrant termination but rather warrants some lesser penalty." *Keebler Co.*, 247 F.3d at 13. When confronted with the CBA and the parties' submission asking him to determine whether just cause existed, we cannot say that the arbitrator unreasonably harmonized the two. *See Trailmobile Trail. v. Inter. Un. of Elec. Workers*, 223 F.3d 744, 747 (8th Cir. 2000) (holding that it was up to arbitrator to harmonize management rights clause with just cause provision of CBA); *Metro Chevrolet v. Union de Tronquistas*, 835 F.2d 3, 4-5 (1st Cir. 1987) (when CBA contains general clause prohibiting termination except for just cause and does not equate certain behavior with just cause, "an arbitrator is empowered to determine whether the employee's action which precipitated the dismissal constitutes just cause").

Had the county wanted the arbitrator to determine only whether Foote had engaged in the conduct of which she was accused, it could have framed the issue accordingly. "If the factual finding were the only bone of contention, why not frame the issue as whether [Foote] committed [abuse]? In essence, [the county] submitted a single question to the arbitrator and now complains that he lacked the authority to answer it." *Hartco Flooring v. Local 14597*, 192 Fed. Appx. 387, 391 (6th Cir. 2006) (not recommended for full-text publication). Having requested that the arbitrator determine whether Foote was discharged for just cause, the county should "not now be heard to complain that the arbitrator performed the analysis that it requested instead of making a purely factual finding." *Trailmobile Trail.*, 223 F.3d at 747.

Further, while the county's interpretation of the submission may be plausible, "[w]e do not agree that the submission to arbitration requires this interpretation, and the ... limitations upon review of arbitration awards militate against an interpretation of the submission which would upset the award[] in this case." *Pelletier*, 109 N.H. at 304; *see LB & B Associates v. International Broth.*, 461 F.3d 1195, 1198 (10th Cir. 2006) (while employer's interpretation of CBA's just cause and immediate discharge provisions was one interpretation, arbitrator read these provisions differently and his interpretation was not unreasonable). The arbitrator's decision that the parties' stipulation "gave him the authority to conduct a just cause analysis is reasonable as well and the interpretation of [the stipulation] [was] within the arbitrator's domain." *Bureau of Engraving*, 284 F.3d at 825. While the county assumes that engaging in one episode of verbal abuse "equaled just cause for termination, ... the arbitrator concluded otherwise. That conclusion will not be disturbed here." *Id.* "Whether the arbitrator's reading of the [CBA and stipulation] was strained or even seriously flawed ... is irrelevant. The arbitrator arguably construed and applied [them], and this is precisely what the parties bargained for him to do." *Bruce Hardwood Floors v. So. Coun. of Ind. Workers*, 8 F.3d 1104, 1108 (6th Cir. 1993); *see LB & B Associates*, 461 F.3d at 1200.

For all of the above reasons, therefore, we hold that the PELRB did not err as a matter of law by enforcing the arbitrator's award.

II

The county next asserts that the PELRB erroneously enforced the arbitrator's award because the award violated public policy. "To so find, we must conclude that the PELRB's order contravenes a strong and dominant public policy as expressed in controlling statutes, regulations, common law, and other applicable authority." *Appeal of Town of Pelham,*

154 N.H. 125, 129 (2006) (quotation omitted). "[I]n such cases our review is limited to the confines of positive law, rather than general considerations of supposed public interests." *Id.*; *see W.R. Grace & Co. v. Rubber Workers*, 461 U.S. 757, 766 (1983).

■ "In the context of an arbitration award that reinstates a fired employee, the question is not whether the charged conduct offends public policy, or whether some remedy short of unconditional reinstatement ... might have been preferable. Rather, the sole question is whether the award itself—the order for reinstatement—gives offense." *Mercy Hospital v. Massachusetts Nurses Ass'n*, 429 F.3d 338, 343 (1st Cir. 2005), *cert. denied*, 126 S. Ct. 1939 (2006); *see Eastern Associated Coal Corp.*, 531 U.S. at 62-63. In making this determination, "we must read the pertinent statutes and regulations in light of background labor law policy that favors determination of disciplinary questions through arbitration when chosen as a result of labor-management negotiation." *Mercy Hospital*, 429 F.3d at 344 (quotation omitted); *Eastern Associated Coal Corp.*, 531 U.S. at 65. Further, "[w]ith a few limited exceptions not relevant here, [we are] bound by [the] arbitrator's findings of fact." *Mercy Hospital*, 429 F.3d at 344. Thus, we examine "only whether the reinstatement award, on the facts as found by the arbitrator, contravenes an explicit, well-defined, and dominant public policy." *Id.* at 345.

The county argues that there are strong and dominant public policies against reinstating an LNA who has been found to have verbally abused a resident and who fails to understand the wrongful nature of her conduct. To support this argument, the county relies upon 42 C.F.R. § 483.13 (2006).

42 C.F.R. § 483.13 provides that a resident of a long-term care facility, like the nursing home, "has the right to be free from verbal, sexual, physical, and mental abuse, corporal punishment, and involuntary seclusion." 42 C.F.R. § 483.13(b). It also provides that a long-term care facility, like the nursing home, must "[n]ot employ individuals who have been ... [f]ound guilty of abusing, neglecting, or mistreating residents by a court of law; or ... [h]ave had a finding entered into the State nurse aide registry concerning abuse, neglect, mistreatment of residents or misappropriation of their property." 42 C.F.R. § 483.13(c)(ii).

We disagree that 42 C.F.R. § 483.13 expresses a strong and dominant public policy against reinstating an LNA who has been found by an arbitrator to have engaged in one episode of verbal abuse and/or who fails to admit her wrongdoing. While the regulation precludes nursing homes from employing individuals who have been found guilty by a court of abusing, neglecting or mistreating residents, as those terms are defined elsewhere, and from employing those for whom the State has entered an

adverse finding into the State's nurse aide registry, it is silent with respect to reinstating an LNA such as Foote.

Foote was not found by a court to have engaged in abuse as that term is used in 42 U.S.C.A. § 3002(1) (Supp. 2007). 42 U.S.C.A. § 3002(1) defines "abuse" as the willful "infliction of injury, unreasonable confinement, intimidation, or cruel punishment with resulting physical harm, pain, or mental anguish ... or ... deprivation ... of goods or services that are necessary to avoid physical harm, mental anguish, or mental illness." The arbitrator did not use this definition and we express no opinion as to whether Foote's conduct meets it.

■ Moreover, the regulation is silent with respect to reinstatement. Other provisions in the same statutory and regulatory scheme, however, reveal that hiring (and, by extension, reinstating) an LNA who engages in a single episode of verbal abuse is not precluded. Pursuant to 42 U.S.C.A. § 1395i-3(g) (Supp. 2007), a nurse aide may petition the State for removal of his or her name from the registry "upon a determination by the State that ... the employment and personal history of the nurse aide does not reflect a pattern of abusive behavior or neglect; and ... the neglect involved in the original finding was a singular occurrence." Thus, under federal law, a nursing home is not precluded from having in its employ an LNA, such as Foote, who was found by an arbitrator to have engaged in one episode of verbal abuse. We therefore conclude that 42 C.F.R. § 483.13 does not "establish a public policy prohibiting [Foote's] reinstatement with [sufficient] clarity." *Boston Medical*, 260 F.3d at 25.

The county mistakenly relies upon the strong and dominant public policy against abuse of nursing home residents as support for its arguments. *See, e.g.*, 42 U.S.C.A. § 1395i-3(c)(1)(A) (Supp. 2007) (residents in skilled nursing facility have "[t]he right to be free from physical or mental abuse"). As discussed previously, "the question is not whether [Foote's] *conduct* violated a public policy in favor of competent nursing care, but whether *the order to reinstate her* violated that policy." *Boston Medical*, 260 F.3d at 23; *see Eastern Associated Coal Corp.*, 531 U.S. at 62-63.

Similarly misplaced is the county's reliance upon *Gogebic Medical Care v. AFSCME Local 992*, 531 N.W.2d 728 (Mich. Ct. App.), *appeal denied*, 549 N.W.2d 560 (Mich. 1995). In that case, unlike the instant appeal, the State had entered an adverse finding against the nurse on the State's nurse aide registry. *Gogebic Med. Care*, 531 N.W.2d at 731. Moreover, *Gogebic Medical Care Facility* was decided before the United States Supreme Court decided *Eastern Associated Coal Corporation* and conflicts with our decision in *Appeal of Town of Pelham*, 154 N.H. at 129-

31. In *Eastern Associated Coal Corporation*, the United States Supreme Court "adhered to the so[-]called narrow approach applied by . . . most . . . federal circuit courts, namely that a reviewing court must find the terms of an award, not the underlying conduct at issue, violated public policy." Glanstein, *A Hail Mary Pass: Public Policy Review of Arbitration Awards*, 16 OHIO ST. J. ON DISP. RESOL. 297, 301 (2001); *see Eastern Associated Coal Corp.*, 531 U.S. at 62-63. We embraced this narrow approach in *Appeal of Town of Pelham*, 154 N.H. at 129-31, where we examined whether there was a strong and dominant public policy against reinstating untruthful police department employees. The court in *Gogebic Medical Care*, 531 N.W.2d at 731, by contrast, examined whether the nurse's underlying conduct violated the general public policy in favor of protecting long-term care facility residents from abuse, not whether there was a strong and dominant public policy against reinstating her.

Because we find that no strong and dominant public policy exists against reinstating an employee such as Foote, we hold that the PELRB did not err as a matter of law by ordering the county to comply with the arbitrator's award. *See Appeal of Town of Pelham*, 154 N.H. at 131.

### III

In its cross-appeal, the union raises the following issues: (1) whether the PELRB erroneously dismissed the bifurcated "Reserved Issues" without an opportunity for the union to address those matters; (2) whether the PELRB applied the wrong legal standard when it failed to admit or take administrative notice of the union's evidence that would have reinforced its position that State agencies with primary responsibility to protect the public interest had recently taken actions to permit Foote to practice as an LNA; and (3) whether, if reinstatement to her former position is improper, Foote may be reinstated to another position in the county. In light of our decision to affirm the PELRB's decision upholding the arbitration award, we conclude that issues (2) and (3) are moot.

With respect to issue (1), the union argues that the PELRB erred when it dismissed the Reserved Issues *sua sponte*. The record submitted on appeal reveals that the hearing officer's March 2, 2006 decision notified the union that the Reserved Issues would be "administratively dismissed unless either party files a request for further PELRB proceedings within 30 days." The record further reveals that on March 24, 2006, the union filed a request for further PELRB proceedings on the Reserved Issues. Nonetheless, on April 19, 2006, the PELRB dismissed the Reserved Issues as moot.

■ The so-called Reserved Issues involved whether the county violated RSA 273-A:5, I (1999) by: (1) refusing to reinstate Foote in contravention of the arbitrator's award, thereby interfering with her licensing obligations and future job prospects; (2) engaging in anti-union discrimination by refusing to reinstate Foote; and (3) failing or refusing to provide discovery materials in connection with a proceeding before DHHS. The union argues that proving anti-union discrimination would "strengthen [its] request for additional remedies," including attorney's fees and costs. Thus, whether the county engaged in anti-union discrimination by failing to reinstate Foote does not appear to be moot. While the county asserts that the arbitrator already addressed the union's anti-union discrimination claim, the county is mistaken. The arbitrator addressed only whether the county engaged in anti-union discrimination when it terminated Foote, not whether it did so when it refused to reinstate her.

In light of the record submitted on appeal, we therefore vacate the PELRB's dismissal of the Reserved Issues as moot and remand for further proceedings consistent with this opinion. *See* RSA 273-A:6, IX (1999) (orders and decisions of PELRB shall contain findings of fact and conclusions of law).

> *Affirmed in part; vacated in part; and remanded.*

GALWAY and HICKS, JJ., concurred; DUGGAN, J., with whom BRODERICK, C.J., joined, dissented.

DUGGAN, J., dissenting. Because I believe that the arbitrator fashioned his own brand of industrial justice, and that affirming the PELRB's decision threatens to create unnecessary uncertainty in our state's labor law jurisprudence, I respectfully dissent. I first explain why I disagree with the majority's analysis, and then set forth how I would resolve this case.

I

The arbitral submission asked the arbitrator to resolve the following inquiry: "Whether there was just cause for the County to terminate Ms. Foote under the collective bargaining agreement? If not, what shall the remedy be?" The majority holds that this submission, combined with the fact that the CBA "did not reference 'just cause'" allowed the arbitrator to apply a "'traditional just cause standard'" to essentially exercise his independent judgment to determine the level of discipline for Foote's conduct.

Article 24 of the CBA provides: "Any instance of physical, verbal, mental or medical abuse/neglect/exploitation of any resident *shall be grounds* for immediate termination." (Emphasis added.) The majority apparently concludes that there is a meaningful difference between article 24 and a hypothetical CBA that provides: "Any instance of physical, verbal, mental or medical abuse/neglect/exploitation of any resident *shall be just cause* for immediate termination." I do not agree. Moreover, drawing such a distinction threatens to create unnecessary uncertainty about how we will resolve future cases. For example, other CBAs might contain language such as: (1) "Any instance of physical, verbal, mental or medical abuse/neglect/exploitation of any resident *shall be reason* for immediate termination"; or (2) "Any instance of physical, verbal, mental or medical abuse/neglect/exploitation of any resident *shall be cause* for immediate termination." We will have to decide where, along a continuum, this alternative language falls, or require parties at the bargaining table to use one synonym, *i.e.* "just cause" over another, *i.e.* "grounds," "reason" or "cause."

Treatises, case law, and dictionaries support the view that "just cause," "cause," "reason" and "grounds" are not distinct concepts when they are used in a collectively bargained-for agreement to describe conduct that serves as an adequate basis for discharge. Those offenses that are "grounds," "cause" or "reason" for termination are necessarily "just cause" for termination. Thus, by expressly and unambiguously providing specific "grounds" for termination, the CBA *did* reference a "just cause" standard.

One respected arbitration treatise observes:

> Most collective bargaining agreements do, in fact, require "cause" or "just cause" for discharge or discipline.... It is common to include the right to suspend and discharge for "just cause," "justifiable cause," "proper cause," "obvious cause," or quite commonly simply for "cause." *There is no significant difference between these various phrases.*

ELKOURI & ELKOURI, HOW ARBITRATION WORKS 887 (5th ed. 1997) (brackets omitted; emphasis added).

Numerous courts use these terms interchangeably. *See, e.g., Intern. Broth. of Firemen v. Nestle Co., Inc.*, 630 F.2d 474, 475-77 (6th Cir. 1980) (repeatedly using "cause" and "grounds" interchangeably); *Bruce Hardwood Floors v. UBC, Indus. Work. No. 2713*, 103 F.3d 449, 455 (5th Cir. 1997) (Benavides, J., dissenting) (using "ground" as synonym for "proper cause"), *cert. denied*, 522 U.S. 928 (1997); *Ohio Off. of Coll. Barg. v. Civ. Serv. Emp.*, 572 N.E.2d 71, 75 (Ohio 1991) (using "ground"

interchangeably with "causes" and holding, "In essence, dishonesty, as a ground for immediate discharge, is *per se* just cause."); *School Dist. of Beverly v. Geller*, 755 N.E.2d 1241, 1247 n.8 (Mass. 2001) (summarizing cases where CBAs list reasons for dismissal and using the terms "just cause," "proper cause," "cause" and "grounds" interchangeably); *Marathon Oil Co. v. Local Union No. 283*, No. 97-1780, 1998 WL 702357, at *2 (6th Cir. Sept. 25, 1998)(using "grounds" and "cause" synonymously).

Neither dictionaries nor thesauruses augur well for a distinction between these terms. *See, e.g.*, AMERICAN HERITAGE DICTIONARY 799 (3d ed. 1992) (definition of "ground" provides: "Often **grounds.** The underlying condition prompting an action; a cause: *grounds for suspicion; a ground for divorce.*"); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 356 (unabridged ed. 2002) ("cause" means "a good or adequate reason: a sufficient activating factor <an employee discharged for ~>"); RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 235 (1966) (similar); BLACK'S LAW DICTIONARY 1031 (8th ed. 1999) ("cause" means "A ground for legal action <the plaintiff does not have cause to file suit>. **good cause.** A legally sufficient reason.... The term is often used in employment-termination cases.—Also termed *good cause shown; just cause; lawful cause; sufficient cause.*"); LEGAL THESAURUS 67 (2d ed. 1992) ("cause" and "ground" are synonyms).

Even the arbitrator, with his broad discretion to construe the CBA, *Paperworkers v. Misco, Inc.*, 484 U.S. 29, 38 (1987), did not specifically offer an interpretation of the word "grounds." Instead, he acknowledged that article 24 provides that "certain kinds of conduct shall be grounds for immediate termination" and "clearly put[s] members of the bargaining unit, including Foote, on notice that they could be subject to immediate termination for incidents of abuse." Then, as the basis for his decision, he appears to have essentially used "just cause" in the arbitral submission as a vehicle to mete out a penalty that he did not find "harsh" or "unreasonable." In so doing, the arbitrator did not engage in contract interpretation, or even permissible contract misinterpretation. *See Misco*, 484 U.S. at 38 ("[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision."). Instead, he departed from the CBA to arrive at his own brand of industrial justice, a result that is prohibited by the plain language of the CBA ("the arbitrator shall have no authority to add to, subtract from, or modify any terms of this agreement"), the plain language of the arbitral submission ("Whether there was *just cause* for the County to terminate Ms. Foote *under the collective bargaining agreement*? If not,

what shall the remedy be?" (emphasis added)), and well-settled, persuasive and overwhelming authority from jurisdictions across the country.

Courts in other jurisdictions consistently hold that where an employment agreement lists certain behavior as grounds or cause for termination, and where there is a finding that such conduct has occurred, the arbitrator is not free to fashion his own remedy. Although the term "just cause" often appears in these cases, its absence does not change the essential reasoning. *See, e.g., Poland Spring Corp. v. United Food, Local 1445*, 314 F.3d 29, 34-35 (1st Cir. 2002), *cert. denied*, 540 U.S. 818 (2003) ("once an arbitrator finds that an employee has committed an act specifically listed in the collective bargaining agreement as providing just cause for termination, the arbitrator is not free to fashion a separate remedy apart from the one provided by the parties' agreement"); *Logistics Personnel v. Truck Drivers Local Union*, 6 F. Supp. 2d 650, 655 (E.D. Mich. 1998) (where CBA provides that testing positive on drug test is grounds for termination, "the only relevant question, under the collective bargaining agreement, is whether the employee ... tested positive"); *Bruce*, 103 F.3d at 452 (where CBA states that employee will be discharged for immoral conduct, arbitrator not free to impose ten-day suspension); *Warrior & Gulf Nav. v. United Steelworkers*, 996 F.2d 279, 281 (11th Cir. 1993), *cert. denied*, 511 U.S. 1083 (1994) (where agreement required "just cause" for termination and listed certain acts for which an employee could be discharged, arbitrator lacked discretion to reduce discharge to suspension); *Delta Queen Steamboat Co. v. Dist. 2 Marine Eng.*, 889 F.2d 599, 601, 604 (5th Cir. 1989), *cert. denied*, 498 U.S. 853 (1990) (where agreement provides for termination for "proper cause" and lists behavior that would constitute cause, arbitrator is not free to weigh proved conduct against other factors); *Georgia-Pacific Corp. v. Local 27*, 864 F.2d 940, 945 (1st Cir. 1988) (where arbitrator uses "just cause" as a means of ignoring specifically enumerated grounds for discharge, he engages in a "patent example of arbitral excess"); *S.D. Warren Co. v. United Paperworkers' Intern.*, 845 F.2d 3, 8 (1st Cir. 1988), *cert. denied*, 488 U.S. 992 (1988) (where agreement provides discharge for "proper cause" and identifies specific causes upon which discharge may be based, arbitrator may not order different remedy for proved conduct); *Metro Chevrolet v. Union de Tronquistas*, 835 F.2d 3, 5 (1st Cir. 1987) (when general "just cause" provision in contract is combined with provision that lists specific conduct upon which discharge may be based, appropriateness of penalty is removed from arbitrator's consideration); *Nestle*, 630 F.2d at 476 (where contract provides insubordination is basis for termination, arbitrator not free to decide that termination is too severe a penalty); *Mistletoe Exp. Serv. v. Motor Expressmen's Union*, 566 F.2d 692, 695

(10th Cir. 1977) (where agreement provides employer may terminate employment if employee fails to meet certain conditions, arbitrator not free to substitute his own judgment for the employer's decision to terminate); *Cty. Coll. of Morris Staff v. Cty. Coll.*, 495 A.2d 865 (N.J. 1985) (where agreement includes list of conduct for which employees can be discharged, arbitrator exceeds his authority by reducing discharge to suspension); *Ohio Off. of Coll. Barg.*, 572 N.E.2d at 75 (agreement provides that abuse of patient is cause to terminate and arbitrator not free to reduce penalty from termination); *City of East Providence v. United Steel Workers of Am., Local 15509*, Nos. 2006-145-Appeal & 2006-162-Appeal, 2007 WL 1828760, at *8 (R.I. June 27, 2007) (where arbitrator determines that just cause exists, it is "patently irrational" for him to exceed his authority by considering an alternate form of discipline). There is no persuasive reason that our state's labor law jurisprudence should be different.

The cases relied upon by the majority are distinguishable. For example, in *Bureau of Engraving v. Graphic Communication International Union*, 284 F.3d 821, 824 (8th Cir. 2002), the arbitral submission asked the arbitrator to determine "'Whether the Employer had just cause to terminate the employment of grievant, Linda Puffer, and if not, what should be the remedy?'" Thus, in contrast to the instant case, the arbitral submission in *Bureau of Engraving* made *no* reference to determining just cause "*under the CBA*." The argument for allowing an arbitrator to depart from the CBA is much stronger when the arbitral submission, for whatever reason, gives the arbitrator broad authority and does not require him to be grounded in the parties' agreement.

In *Homestake Mining Co. v. United Steelworkers of America*, 153 F.3d 678, 680 (8th Cir. 1998), the arbitrator determined that the worker's conduct did not constitute a violation of the employer's rule. Here, by contrast, the arbitrator expressly found that Foote *did* abuse the elderly resident.

In *Trailmobile Trailer, LLC v. International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers*, 223 F.3d 744, 746 (8th Cir. 2000), a handbook provision that listed examples of conduct that "*may* subject an employee to immediate discharge without warning" was at issue, and the CBA provided that the employer could only enforce "reasonable rules." In the instant case, there is no provision at issue regarding the enforcement of "reasonable rules" and the proscribed conduct is written directly into the CBA.

In *LB & B Associates v. International Brotherhood*, 461 F.3d 1195, 1196 (10th Cir. 2006), the CBA provided that an employee who engaged in sexual harassment "'may be subject to immediate discharge.'" *Id.*

(emphasis omitted). The Tenth Circuit expressly noted that if the CBA did not use such permissive language, a different outcome would have obtained. *Id.* at 1198 n.2. The CBA here uses the word "shall." *See Dancart Corp. v. St. Albans Rubber Co.*, 124 N.H. 598, 602 (1984) (the word "shall" "commonly does have a mandatory character").

In *Boston Medical v. Service Employees, Local 285*, 260 F.3d 16, 21 (1st Cir. 2001), *cert. denied*, 534 U.S. 1083 (2002), there was no provision at issue which enumerated specific grounds for dismissal. Instead, the arbitrator was charged with reconciling a management rights clause, reserving to management the exclusive right to discipline, and a clause providing that employees could be discharged only for "just cause." *Id.* at 20-21. The First Circuit expressly noted that *Boston Medical* is distinguishable from "a case where the collective bargaining agreement specifically provides for automatic discharge in [certain] situations . . . ." *Id.* at 23 n.5.

In *Local 238 International Brotherhood of Teamsters v. Cargill, Inc.*, 66 F.3d 988, 990 (8th Cir. 1995), the Eighth Circuit found "an inherent tension or ambiguity" between the CBA and a drug and alcohol policy that was not "written verbatim into the collective bargaining agreement." However, the court clearly stated that "[i]f the collective bargaining agreement expressly provided that an employee who refuses to take an alcohol test 'will be terminated,' we would agree with the district court's decision that the arbitrator's award 'ignored the plain mandatory language' of that agreement . . . ." *Id.* Here, the CBA states that abuse shall be grounds for termination. No separate policy is involved.

In order to uphold the arbitrator's decision, the majority turns to a seven-factor test. There are two reasons why we should not turn to that test *in this case*. First, the arbitral submission did not ask the arbitrator to decide: "Whether there was just cause for the County to terminate Ms. Foote? If not, what shall the remedy be?" Instead, it asked the arbitrator to resolve the following concrete inquiry: "Whether there was *just cause* for the County to terminate Ms. Foote *under the collective bargaining agreement*? If not, what shall the remedy be?" (Emphasis added.) Thus, the arbitrator's decision had to be anchored in the plain language of the CBA, language that unambiguously lists the conduct that constitutes "grounds"—"just cause"—to terminate. The arbitrator was not free to depart from that language. If the parties had no intention of requiring the arbitrator to enforce the unambiguous contract terms, then they would not have inserted the phrase "under the collective bargaining agreement" into the arbitral submission.

Second, as the United States Court of Appeals for the Eleventh Circuit has explained, the type of broad "just cause" analysis embodied by the

seven-factor test comes into play when a collective bargaining agreement does not spell out conduct that shall serve as an adequate basis for discharge. *Warrior Gulf & Nav.*, 996 F.2d at 281 n.8. It is not employed in every single case.

The Eleventh Circuit's explanation is not inconsistent with *Appeal of City of Manchester*, 153 N.H. 289, 293 (2006), where we cited the seven-factor test with approval, but noted that in deciding just cause issues, the arbitrator has "the authority to consider the underlying issues and surrounding circumstances necessary to interpret and *apply the express provisions of the CBA* and reach a final decision." (Emphasis added.) Here, the arbitrator examined the surrounding circumstances and found abuse. He was then compelled to apply the express provisions of the CBA. Nothing in *Appeal of City of Manchester* authorizes the arbitrator to supplant an express CBA provision with a seven-factor test. If we conclude that "just cause" means employing a seven-factor test in every case, then employers will never be able to make specific types of conduct grounds for immediate termination, because anytime they try to do so, their disciplinary decisions will be subject to upset by an arbitrator.

The majority states that if the county was concerned that the arbitrator might second-guess its decision to discharge Foote, then it could just have asked the arbitrator to "determine only whether Foote had engaged in the conduct of which she was accused." If that is true, then both sides would have had to have been agreeable to the idea that under the CBA, abuse, alone, *does* constitute a valid basis to terminate employment. Clearly (and understandably), given the posture of this case, the union would never have made such a concession. In fact, it would seem that firing Foote for abuse was one impetus that led the union to grieve the case in the first place. Furthermore, it seems unfair to fault the county for failing to anticipate that the arbitrator would depart from the plain language of the CBA.

To borrow from the First Circuit:

> The reservation of a right to . . . discharge for [a particular type of conduct] would be wholly ineffective and meaningless if the employer's action, pursuant to such right, is subject to review by an arbitrator on the basis of appropriateness. If the reserved right is construed to mean that the employer can take no disciplinary action in excess of a reprimand, except at its own risk and subject to severe penalties in case an arbitrator should later be of the opinion that some milder action is appropriate, the effect would be that the employer's inherent right which has not been expressly relinquished by contract is no right at all.

*Metro Chevrolet,* 835 F.2d at 5 (quotation omitted).

## II

Accordingly, I would adopt the reasoning of the cases that hold that where a CBA lists particular types of conduct as grounds for termination, the arbitrator's inquiry ends when he finds that such conduct has occurred. Consistent with those cases, I would hold that although the "arbitrator ha[d] the authority, in the context of a just cause grievance, to consider the underlying issues and surrounding circumstances necessary to interpret and apply the express provisions of the CBA and reach a final decision," *Appeal of Town of Pelham,* 154 N.H. 125, 128 (2006), his award nevertheless had to be consistent with the CBA and the arbitral submission. *LaRocque v. R.W.F., Inc.,* 8 F.3d 95, 96-97 (1st Cir. 1993).

Article 24 does not say that termination for abuse may occur only where equitable or "fair." *See Poland Spring,* 314 F.3d at 38 (Boudin, C.J., concurring). Rather, it states, *"Any* instance of physical, verbal, mental or medical abuse/neglect/exploitation of any resident *shall be grounds* for immediate termination." (Emphasis added.) This language unambiguously gives the county just cause to terminate employment where abuse occurs. Moreover, article 2 of the CBA reserves "exclusively" to management the right to "discipline or discharge" employees. Taken together, articles 2 and 24 plainly contemplate that certain management decisions, such as termination for abuse, will not be second-guessed during arbitration. Significantly, as part of the CBA, these two provisions were among the terms and conditions bargained for *by the parties* and it was not for the arbitrator to ignore them. If the parties desired some other outcome, they were free to negotiate for other language to be included within the CBA.

> The paramount point to be remembered in labor arbitration is that the power and authority of an arbitrator is totally derived from the collective bargaining agreement and that he violates his obligation to the parties if he substitutes his own brand of industrial justice for what has been agreed to by the parties.

*Id.* at 33 (quotations omitted).

The rationale for this holding is persuasive: "contractual provisions like the [termination for abuse] clause ... are bargained for and inserted precisely to take discretion away from arbitrators charged with enforcing the collective bargaining agreement." *Poland Spring,* 314 F.3d at 34-35.

> [T]o sustain [the arbitrator's decision] in this case, notwithstanding the pre-negotiation that took place, [is] the equivalent of ... saying that the parties engaged in a meaningless

act by negotiating the disciplinary rules and incorporating them into the collective bargaining agreement. [It says] that the arbitrator retained the right to fashion remedies even when this *contractual* authority was not given by the parties. That is not the law.

*Warren*, 845 F.2d at 8.

The approach outlined above may seem unfair when applied to the instant case, especially since other employees had not been discharged for abusive conduct. However, the arbitrator was free to interpret the word "abuse," and apply it however he saw fit. He was also free to find that Foote's conduct did not constitute "abuse" within the meaning of the CBA. That said, once he made a finding that abuse occurred, the CBA unambiguously required him to uphold the county's decision to terminate employment under the CBA. No interpretation of that directive is required, and ignoring it is reversible error.

In conclusion,

[i]t is not . . . satisfactory to say to employers that they can draft the collective bargaining agreement to clearly restrict the arbitrator from exercising the authority the arbitrator applied here. The realities of what happens at the bargaining table may make this illusory. [The CBA article at issue] was admirably drafted to give management some flexibility and give workers the protection that not every instance of [prohibited conduct] must mean termination. It can be questioned why the price of that flexibility should be to permit an arbitrator to second guess management's judgment to be less forgiving [in certain instances].

*Poland Spring*, 314 F.3d at 42 (Lynch, J., dissenting). I would not impose such a price, and therefore respectfully dissent.

BRODERICK, C.J., joins in the dissent.