Grafton
No. 2011-318

## LEBANON HANGAR ASSOCIATES, LTD.

v.

## CITY OF LEBANON

Argued: April 5, 2012
Opinion Issued: June 12, 2012

*Schuster, Buttrey & Wing, P.A.*, of Lebanon (*Barry C. Schuster* and *Eric G. Derry* on the brief, and *Mr. Schuster* orally), for the plaintiff.

*Gardner Fulton & Waugh, P.L.L.C.*, of Lebanon (*Adele M. Fulton* on the brief and orally), for the defendant.

LYNN, J. The plaintiff, Lebanon Hangar Associates, Ltd. (LHA), appeals the decision of the Superior Court (*Vaughan*, J.) vacating an arbitrator's decision that the plaintiff was not required to pay taxes under a lease agreement with the defendant, the City of Lebanon. We reverse and remand.

I

The arbitrator found, or the record supports, the following facts. LHA has leased property at the Lebanon Airport from the City, the owner of the land, since 1991. Although the terms of the lease require LHA to pay "taxes . . . lawfully levied or assessed," between 1991 and the first half of 2006, the City did not tax LHA on the value of the land itself, limiting its assessment of taxes to the value of the buildings. In October 2006, the City assessed a tax upon the value of the land, thereby increasing the total valuation subject to taxation from $77,400 in 2005 to $360,400 in 2006. After unsuccessfully requesting an abatement from the City, LHA petitioned the superior court, pursuant to RSA 76:17 (2003), to rule that the leasehold is not taxable. LHA subsequently moved to amend its petition to add a claim that the City breached the lease by demanding the payment of taxes. In response, the City invoked an arbitration clause in the lease that states, "Any controversy arising out of or relating to this lease or the breach thereof shall be settled by arbitration." The City argued that "if there is a controversy about the lease itself, it must be settled through arbitration."

Thereafter, the parties filed a stipulation with the court in October 2008 indicating that they had agreed to proceed to arbitration. The stipulation stated: "The City has . . . requested arbitration and the parties are currently arranging arbitration to address the controversies arising out [of] the Lease." It also stated: "[T]he parties shall undertake arbitration of the matters concerning the controversies arising out of the Lease."

The parties then proceeded to arbitration. During the first stage of arbitration, LHA argued that the lease unambiguously forbids the City from assessing real estate taxes on the land. In support of its argument, LHA presented evidence that: (1) the City's attorney wrote a letter contemporaneously with the 1991 lease agreement stating that there would be "no real estate taxes on City owned land"; and (2) from 1991 to 2006, the City did not tax LHA on the leased land. The City presented contrary evidence on both points. To support its argument that the lease is an integrated agreement that requires LHA to pay taxes on the land, the City presented a copy of the written lease itself. To support its alternative argument that it should prevail even if the arbitrator disagreed with its first argument, the City also presented extrinsic evidence purporting to show that it had taxed LHA on the leased land since 1996, and that LHA paid the tax during that time.

In April 2009, the arbitrator issued the first of two decisions, concluding that, while the written lease unambiguously allows the City to assess a tax upon the value of LHA's leased land, other evidence submitted by LHA could serve as the basis for reforming the lease based upon mutual mistake. At the next hearing, LHA asserted its reformation argument over the objections of the City, which contended that the arbitrator's authority was limited to deciding the meaning of the four corners of the lease agreement. After reviewing the evidence, the arbitrator issued a second, and final, decision in March 2010, concluding that LHA "is not and has not been obligated to pay real estate taxes to the City" under the lease. The arbitrator found, in particular, that the City did not tax LHA on the value of the land until 2006, when the dispute at issue first arose — thus rejecting the City's evidence to the contrary. LHA then moved to confirm the decision in superior court, and the City moved to vacate it. The superior court agreed with the City and vacated the arbitrator's decision except for the finding that the written lease terms required payment of taxes on the land. This appeal followed.

## II

The issue on appeal is whether the arbitrator exceeded the scope of his authority by reforming the lease based upon mutual mistake. The City argues that the issue submitted to the arbitrator was limited to whether the

written lease terms required LHA to pay taxes on the value of the land; having concluded that the written lease terms answered that question in the affirmative, the arbitrator lacked power to adjudicate the dispute any further. The trial court agreed with the City's position. LHA, on the other hand, contends that the arbitrator properly resolved the broader issue of whether the land is taxable under the parties' lease agreement.

 Judicial review of an arbitrator's decision is limited. RSA 542:8 (2007) allows a party to arbitration to apply to the superior court to confirm, correct, or modify an award on one of several grounds, including that the arbitrator has exceeded his powers. A judicial challenge to arbitral authority requires the reviewing court to consider both the contract and the arbitral submission, as well as the stipulation to the court describing the scope of issues the parties intend to arbitrate. *See* RSA 542:3-a (2007) ("A stipulation filed prior to trial in any civil case pending in the superior court, in which all of the parties or their attorneys agree to submit the case to arbitration, shall, upon approval of the court, be considered an agreement in writing to submit to arbitration . . . ."); *Appeal of Merrimack County*, 156 N.H. 35, 39 (2007); *see also Local 238 Intern. Broth. Teamsters v. Cargill, Inc.*, 66 F.3d 988, 991 (8th Cir. 1995) ("Once the parties have gone beyond their promise to arbitrate and have actually submitted an issue to an arbiter, we must look both to their contract and to the submission of the issue to the arbitrator to determine his authority." (quotation omitted)). An arbitrator's jurisdiction over an issue depends upon the voluntary agreement of the parties. *See Appeal of Board of Trustees of U.S.N.H.*, 129 N.H. 632, 635 (1987); *Appeal of Police Comm'n of City of Rochester*, 149 N.H. 528, 534 (2003). Accordingly, the overriding concern is whether the contracting parties intended to arbitrate a particular dispute.

Because the trial court's conclusion as to the scope of the arbitrator's authority is a question of contract interpretation, we review that decision *de novo. Cf. Sabinson v. Trustees of Dartmouth College*, 160 N.H. 452, 458 (2010). Moreover, an arbitrator's view of the scope of the issue is entitled to the same deference normally accorded to the arbitrator's interpretation of the contract. *Appeal of Merrimack County*, 156 N.H. at 40.

 "In the absence of clearly restrictive language, great latitude must be allowed in the framing of an award and fashioning of an appropriate remedy." *John A. Cookson Co. v. New Hampshire Ball Bearings*, 147 N.H. 352, 361 (2001) (quotations omitted). "Technical precision in making a submission is not required and submissions are given a liberal construction in furtherance of the policy of deciding disputes by arbitration . . . ." 4 AM. JUR. 2D *Alternative Dispute Resolution* § 61, at 122 (2007).

LHA argues that the arbitrator did not exceed the scope of his authority because: (1) the lease itself provides that "[a]ny controversy arising out of or relating to this lease or the breach thereof" is to be submitted to arbitration; (2) the stipulation agreement submitted to the court stated that the parties were agreeing to arbitrate "the matters concerning the controversies arising out of the Lease"; and (3) the parties' conduct during the arbitration proceedings confirmed the broad scope of the matters submitted. The City argues that the arbitrator's authority was limited to whether the terms of the written lease required the payment of taxes on the land, and that the arbitrator exceeded the scope of his authority when he decided that the lease should be reformed in light of other evidence.

## III

We agree with LHA that the arbitrator did not exceed the scope of his authority in this case.[1] As is clear from the above discussion, we must examine the submission agreement together with the contract and the stipulation to determine whether the parties intended to resolve the question ultimately decided by the arbitrator. The City apparently recognizes that both the written lease and the stipulation to arbitrate contain language suggestive of a broad scope of authority. The written lease states that "[a]ny controversy arising out of or relating to this lease or the breach thereof shall be settled by arbitration." Similarly, the stipulation to arbitrate states that "the parties shall undertake arbitration of the matters concerning the controversies arising out of the Lease." Both documents contain broad language encompassing the underlying question of whether the City is permitted to impose a tax upon the value of the land. The City nonetheless contends that the arbitrator was only asked, in the parties' "submission agreement," to construe the terms of the written lease.

■ At the outset, it is important to observe that the parties to this case did not create an integrated written submission agreement from which we might discern with confidence that the issue submitted to the arbitrator was expressly narrower than that contained in the written lease agreement or the stipulation filed with the court.[2] Aside from the lease and the stipulation, the only evidence regarding the scope of issues submitted to the

---

[1] The City filed a motion to strike two portions of LHA's brief, arguing that they go beyond the scope of the only issue on appeal, *i.e.*, whether the trial court correctly determined that the arbitrator exceeded the scope of his authority. While we agree that the merits of the arbitrator's decision are not before us as such, we necessarily must consider the arbitrator's actions in the arbitration proceedings to determine whether he had the authority to rule as he did. Because we make no judgment about any issue beyond the scope of the arbitrator's authority, the City's motion is denied as moot.

[2] A submission agreement "is a contract, whereby two or more parties agree to settle their respective legal rights and duties by referring the disputed matters to a third party, by whose

arbitrator is contained in three letters in the record: two between the parties themselves and one from the arbitrator to the parties stating his understanding of the issue submitted in light of an earlier conference call.

■ A review of these documents reveals that the arbitrator did not. exceed the scope of his authority when he ultimately decided that the facts supported reformation of the lease in light of a mutual mistake. In June 2008, the City wrote to LHA that the arguments it would make to the arbitrator were: (1) that the lease agreement is integrated; (2) that the lease agreement requires LHA to pay taxes; and (3) that LHA breached the agreement when it filed suit in superior court against the City, "where the lease agreement requires that any controversy arising out of or relating to the lease *or the breach thereof* shall be settled by arbitration." In September 2008, LHA wrote to the City that the issue to be presented to the arbitrator is "whether the City is permitted under the Lease to impose real estate taxes on the value of the land LHA leases from the City."[3] And, in November 2008, after a conference call discussing the arbitration, the arbitrator wrote to the parties, explaining that he understood the issue to be "whether the lease between [LHA and the City] allows the City to tax LHA for the use of City land."

While it is true, as the City contends, that the parties may freely submit a narrower scope of issues to arbitration than that which the contractual arbitration clause would allow, the above exchanges do not support the

---

decision they agree to be bound." 4 AM. JUR. 2D *Alternative Dispute Resolution* § 61, at 122; *see Citigroup Global Markets, Inc. v. Bacon*, 562 F.3d 349, 351 (5th Cir. 2009) ("a document executed by both parties and presented to the arbitrators in order to outline the dispute and the desired arbitration procedures").

[3] We note here that the City's brief misquotes both letters. The City quotes its own June 2008 letter to LHA as stating that the issue was "whether LHA is liable for taxes on the leased land *based on the terms of the lease*." (Emphasis in original.) In fact, that letter states that the City intended to argue, more generally, that "the lease agreement requires [LHA] to pay all taxes . . . on the leased premises and property it owns." Similarly, the City quotes the September 2008 letter from LHA to the City as formulating the issue as "whether, *under the terms of the lease*, the parties agreed that the City could assess and impose upon LHA real estate taxes for the City land leased to LHA." (Emphasis in original.) In fact, that letter states the issue, more generally, as "whether the City is permitted under the Lease to impose real estate taxes on the value of the land LHA leases from the City."

These erroneous references to the record are troubling because they go to the very heart of the issue in this case — the scope of the arbitrator's authority. The language in the misquoted versions arguably implies that the scope of the issue was limited to the terms contained within the four corners of the lease, rather than the lease *agreement*.

In a motion for reconsideration filed with this court after this opinion was issued, counsel for the City represents that these erroneous quotations were done inadvertently and without any intent to mislead. Based on the fact that the City accurately described the content of the letters elsewhere in its brief and provided accurate copies of the letters in its appendix, we accept this representation. We hope that this occurrence will serve to highlight the importance of ensuring that factual references to the record are accurate.

City's argument that the arbitrator's ultimate decision — that a mutual mistake warrants reformation of the lease agreement — exceeded the scope of his authority. The June 2008 letter from the City frames the issue as whether "the lease agreement" — not the four corners of the written contract — requires LHA to pay real estate taxes on the value of the land. By concluding that the parties to the 1991 contract had made a mistake as to the terms of the written agreement in light of the other evidence — including fifteen subsequent years during which the City assessed taxes on the buildings but not the land and a 1991 letter from the City attorney advising that LHA would not be assessed a tax upon the land — the arbitrator addressed that issue directly. Similarly, both the September 2008 letter from LHA and the November 2008 letter from the arbitrator describe the issue as whether the City is permitted *under the lease* to impose real estate taxes on the value of the land; the arbitrator's final decision directly answers that question in the negative. Insofar as the City now implies that a "lease" or "lease agreement" refers only to the written contract, thus limiting the arbitrator's authority to reviewing the four corners of the document, such a construction is inconsistent with the definition of a lease as the agreement between the parties, not merely the written embodiment of that agreement. *See, e.g.*, BLACK'S LAW DICTIONARY 970 (9th ed. 2009) (defining "lease" as a "contract by which a rightful possessor of real property conveys the right to use and occupy the property in exchange for consideration . . . ."). In other words, the arbitrator's decision to consider whether the lease should be reformed because of a mutual mistake was not separate from, but rather an integral part of, his duty of interpreting the meaning of the lease.

▮ ▮ Moreover, to the extent the City rests its position upon the arbitrator's November 2008 letter explaining his understanding of the scope of his authority, the arbitrator stated at a later hearing that he did not mean to imply that he would consider "only the existing language of the lease and . . . no other evidence or remedy relating to the lease." The arbitrator based that interpretation in part on the fact that he was relying in that letter upon a "general explanation from counsel" about the submitted issue, and in part upon the fact that there was an issue at the outset "of whether extrinsic evidence would be allowed." His interpretation of the scope of his authority "is entitled to the same deference normally accorded to the arbitrator's interpretation of [the contract]." *Appeal of Merrimack County*, 156 N.H. at 40. It is of no moment that the arbitrator entertained doubts about whether he had the power to allow LHA to present its evidence as an argument for the equitable remedy of reformation; especially in the absence of a written submission agreement from

which we might discern that the arbitrator impermissibly strayed from the question submitted, it is the arbitrator's ultimate understanding of the scope of his authority that must be accorded deference by a reviewing court. *See Bull HN Information Systems v. Hutson*, 229 F.3d 321, 332 (1st Cir. 2000) ("As other courts have noted, the arbitrator's interpretation of the scope of the issue submitted to him is to be treated with great deference, and must be upheld so long as it is rationally derived from the parties' submission." (citations and quotations omitted)).

The parties' conduct at the arbitration proceedings also confirms that the parties did not understand that the issue to be arbitrated was limited to interpretation of the four corners of the lease agreement. The City itself argued that extrinsic evidence supported its view that it could tax LHA on the value of the land, including an assertion that LHA had in fact paid taxes on the land between 1996 and 2006 — an assertion the arbitrator considered and expressly rejected based upon other evidence. Had the City actually believed that the issue submitted to the arbitrator was limited to interpreting the four corners of the 1991 written lease, there would have been no need to present such extrinsic evidence.

█ In addition, ample authority supports the general proposition that "arbitrators are free to fashion forms of relief to suit the facts and equities of the case regardless of whether the remedy could [be] ordered by a court in law or equity." 4 AM. JUR. 2D *Alternative Dispute Resolution* § 177, at 232. In this regard, the trial court's conclusion that the equitable remedy of reformation in light of a mutual mistake is a *different issue* than the legal question about the interpretation of the written lease misses the mark. As noted in a prominent treatise: "The *remedy of reformation* to correct a mutual mistake in a contract is well established and has been consistently recognized by arbitrators." ELKOURI & ELKOURI, HOW ARBITRATION WORKS 1229 (Ruben ed., 6th ed. 2003) (emphasis added); *see also id.* at 439 (In the "limited circumstance" of a mutual mistake, "an arbitrator may reform the contract to reflect the true intent of the parties.").

█ By holding that the arbitrator did not exceed the scope of his authority in concluding that the evidence supported the equitable remedy of reformation, we reaffirm that the primary purpose of arbitration is to resolve disputes expeditiously, and that an arbitrator's decision is therefore reviewable only in a narrow set of circumstances. *See City of Rochester*, 149 N.H. at 535; *Dutson v. Nationwide Mut. Ins. Co.*, 383 A.2d 597, 599 (R.I. 1978) ("The whole purpose of arbitration is to provide an alternative procedure whereby two or more parties can finally resolve their differences in an expeditious and economical proceeding."). Any doubts held by a reviewing court concerning what the parties intended to arbitrate should be

678

resolved in favor of arbitration. *See, e.g., Volt Info. Sciences v. Leland Stanford Jr. U.*, 489 U.S. 468, 475-76 (1989); *In re Guardianship of Cantu de Villarreal*, 330 S.W.3d 11, 23 (Tex. App. 2010).

*Reversed and remanded.*

DALIANIS, C.J., and CONBOY, J., concurred.